**SEABURY MANAGEMENT, INC., Plaintiff,**

v.

**PROFESSIONAL GOLFERS' ASSOCIATION OF AMERICA, INC., et al., Defendants.**

Civ.A. No. MJG–92–530.

United States District Court, D. Maryland.

April 26, 1994.

---

Ty Cobb, Hogan & Hartson, Baltimore, MD, John B. Williams, James R. Loftis, III, Catherine A. Micklitsch, Collier, Shannon, Rill & Scott, P.H., Washington, DC, for Seabury Management, Inc.

David Stewart Eggert, Stephen M. Sacks, Arnold and Porter, Washington, DC, John Henry Lewin, Jr., Venable, Baetjer and Howard, Baltimore, MD, for Professional Golfers' Ass'n of America, Inc., Dick Smith.

Steven M. Nemeroff, College Park, MD, Stephen M. Sacks, Arnold and Porter, Washington, DC, John Henry Lewin, Jr., Venable, Baetjer and Howard, Baltimore, MD, for Middle Atlantic Section, Professional Golfers' Ass'n of America, Inc.

Stephen M. Sacks, Arnold and Porter, Gary R. Leadbetter, Clark, Leoner, Fortenbaugh and Young, Conshohocken, PA, John Henry Lewin, Jr., Venable, Baetjer and Howard, Baltimore, MD, for Professional Golfers' Ass'n, Philadelphia Section, Inc.

GARBIS, District Judge.

### MEMORANDUM AND ORDER

The Court has before it Defendants' Professional Golfers' Association of America, Inc. ("the PGA") and Middle Atlantic Section Professional Golfers' Association of America, Inc. ("the MAPGA") Post–Trial Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial. The Court has considered the legal memoranda submitted by the parties and has had the benefit of the arguments of counsel.

### I. BACKGROUND

At issue in this jury trial was a dispute over a five-year contract ("the Contract") entered into by Plaintiff Seabury Management, Inc. ("Plaintiff" or "Seabury") and Defendant MAPGA in 1989 which allowed Seabury to "promote, produce, and conduct" a golf trade show. Seabury claims that this contract gave it the right to use the MAPGA name and logo to conduct and promote a golf trade show anywhere in the United States. The Defendants claim that the contract (con-

sistent with the parties' intent) limited any MAPGA-sponsored golf trade show to an area within the MAPGA's territorial boundaries.

The case proceeded to trial on eleven Counts,[1] including:

Count 1 Breach of Contract against the MAPGA

Count 2 Tortious Interference with Contract against the PGA

Count 3 Tortious Interference with Prospective Business Relations against the PGA

Count 4 Violation of § 2 of the Sherman Act (monopolization) against the PGA

Count 5 Violation of § 2 of the Sherman Act (attempted monopolization) against the PGA

Count 6 Violation of § 2 of the Sherman Act (conspiracy/combination to monopolize) against both Defendants

Count 7 Violation of § 1 of the Sherman Act (restraint of trade) against both Defendants

Count 9 Violation of Maryland's Antitrust Act (monopolization) against the PGA

Count 10 Violation of Maryland's Antitrust Act (attempted monopolization) against the PGA

Count 11 Violation of Maryland's Antitrust Act (conspiracy/combination to monopolize) against both Defendants

Count 12 Violation of Maryland's Antitrust Act (contract, combination or conspiracy to unreasonably restrain trade) against both Defendants

Plaintiff sought actual damages, treble damages, punitive damages and reimbursement of Seabury's costs and fees, including attorney's fees.

A special verdict form having been submitted to the jury, the jury returned a verdict for Plaintiff, finding specifically that: (1) the MAPGA breached its contract with Seabury; (2) the PGA and the MAPGA were not part of a single economic unit; (3) the PGA had conspired with both the MAPGA and the

Golf Manufacturers and Distributors Association ("the GMDA") to illegally restrain trade; and (4) Seabury had established its monopolization and attempted monopolization claims against the PGA. The jury awarded Plaintiff $2.6 million in compensatory damages and $4.8 million in punitive damages.

The Defendants now move for judgment as a matter of law or, in the alternative, a new trial.

## II. *LEGAL STANDARDS*

### A. New Trial

■ A motion for a new trial involves a "comparison of opposing proofs." *Williams v. Nichols,* 266 F.2d 389, 393 (4th Cir.1959). These opposing proofs are based on the judge's interpretation of the evidence. A motion for a new trial under Fed.R.Civ.P. 59, unlike a motion for a directed verdict under Fed.R.Civ.P. 50(a), may be based on the judge's personal weighing of the evidence and his own evaluation of the credibility of the witnesses. *Wyatt v. Interstate Ocean and Transport Co.,* 623 F.2d 888 (4th Cir. 1980). As stated by the Fourth Circuit:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Aetna Casualty and & Surety Co. v. Yeatts,* 122 F.2d 350, 352 (4th Cir.1941). *See also Gill v. Rollins Protective Services,* 836 F.2d 194, 196 (4th Cir.1987); *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 298 (4th Cir. 1984); *Wyatt,* 623 F.2d 888.

### B. Judgment as a Matter of Law

■ A judgment as a matter of law should be granted "where there is no substantial evidence in opposition and, without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the verdict."

---

1. Two Counts (8 and 13) alleging price-fixing practices had been dismissed on the Defendants' motion for summary judgment. In this memo-randum, the Counts are referred to by their original numbers.

*Poynter v. Ratcliff,* 874 F.2d 219, 222–23 (4th Cir.1989). Unlike a motion for a new trial, where the Court examines the quality of the evidence, a motion for judgment as a matter of law requires the Court to examine the sufficiency of the evidence. Under this standard, the Court is required to view the evidence "most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524, at 544–45. The Court notes that this is a stricter standard than that for granting a new trial.

### III. *DISCUSSION*

#### A. Contract Claim

At the core of this dispute is the scope of the Contract rights Plaintiff received. Plaintiff asserts it could have held a MAPGA-sponsored golf trade show anywhere in the United States and Defendants assert that the contract limited this right to the MAPGA's territorial boundaries. As discussed below, the Court concludes that the Contract was ambiguous on the point at issue.

■ It is necessary to consider the Contract in its entirety, including the September 1989 amendment. When so read, there is a reasonable basis for a jury verdict for either side. Plaintiff's strongest argument is derived from Paragraph 3, which states, without reference to any geographic limitation, that Seabury was responsible for selecting the location of the golf trade show. Of course, that is not the only pertinent provision. If it were, Seabury would likely have been entitled to summary judgment. However, there are also Contract provisions which support—but do not definitely establish—the Defendants' position.

Paragraph 1 reads, in pertinent part, "Seabury shall not use, display, make reference to, or otherwise incorporate the MAPGA name, logo, affiliation, sponsorship, etc., for any reason other than in furtherance of the purposes set forth in this Agreement, outside the territorial limits of MAPGA at any time without the express written consent of MAPGA."

Paragraph 2 contains a non-compete clause that prevents Seabury from holding a golf trade show within the MAPGA's boundaries for a two-year period of time should Seabury terminate its contract with the MAPGA.

The Defendants argue that these references to the MAPGA's geographic boundaries necessarily imply such limitations to the entire contract. Of course, this language permits such an implication but, in the view of the Court does not compel it.

The words of language of paragraph 1 could reasonably be interpreted as a limitation on promotional materials only. In other words, they can be read as providing Seabury with the ability to use the MAPGA name and logo outside of the territory for any purpose related to the golf trade show but for no other purpose. The words of paragraph 2 could reasonably be viewed as a deliberate restriction of the "non-compete" protection given the MAPGA to an area less than, rather than co-extensive with, the geographical scope of the Contract.

■ Where there is an ambiguity in a contract, the question of interpretation is, generally, a question of fact to be resolved by the finder of fact. *See Martin Marietta Corp. v. INTELSAT,* 978 F.2d 140, 143 (4th Cir.1992) ("[T]he construction of ambiguous contract provisions is a factual determination."). In cases of contract ambiguity the Fourth Circuit has stated: "Only an unambiguous writing justifies [judgment as a matter of law] without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible of two reasonable interpretations.'" *World–Wide Rights Ltd. Partnership v. Combe, Inc.,* 955 F.2d 242, 245 (4th Cir.1992) (quoting *American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir.1965)).

■ Since the contract language is ambiguous, it was necessary for the jury to consider evidence extrinsic to the four corners of the Contract to ascertain the parties' intent. In this case, the extrinsic evidence by no means pointed in only one direction. There was adequate evidence to support a verdict for either side. In the end, Plaintiff got the

verdict on the breach of contract claim.[2] Since the verdict was a reasonable one— although by no means the only reasonable one—the Court will not grant the Defendants' judgment as a matter of law nor a new trial on Count 1.

## B. Antitrust Conspiracy Claims

■ To prevail on a § 1 claim under the Sherman Act, a plaintiff must establish a contract, combination or conspiracy in unreasonable restraint of trade. 15 U.S.C. § 1 (1973). This section does not prevent business decisions made and behavior engaged in by a single economic unit. Rather, this section focuses on the joining of two groups whose actions then result in an unreasonable restraint of trade. Thus, the critical inquiry here is whether the Defendants were legally capable of conspiring under the Sherman Act.

Plaintiff argued that the PGA and the MAPGA, a PGA section, conspired to limit Seabury's ability to conduct a golf trade show in violation of the Sherman Act and/or the Maryland Antitrust Act.[3] The Defendants assert that as a matter of law the PGA cannot conspire with its sections under the doctrine established in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Accordingly, the Defendants argue, the conspiracy claims must be resolved in their favor.

In *Copperweld*, the Supreme Court held that a parent corporation was not legally capable of conspiring with its wholly-owned subsidiary corporation for purposes of the antitrust laws. In reaching this result, the Supreme Court recognized that the corporations involved functioned as one integrated business entity despite being separately incorporated. The Supreme Court carefully limited its holding to the specific relationship of parent and wholly-owned subsidiary and expressly refused to decide under what circumstances, if any, affiliated but not wholly-owned entities could conspire. Rather, the *Copperweld* Court recommended that, in the future, courts consider whether affiliated corporate entities have a complete unity of interest in determining whether the entities could legally conspire for purposes of the antitrust laws. *Copperweld*, 467 U.S. at 771–72, 104 S.Ct. at 2741–42. This is a functional inquiry that looks to substance over form, *id.* at 773 n. 21, 104 S.Ct. at 2743 n. 21, and one which focuses on whether the "parent" organization controls the "subsidiary" (without regard to the particular corporate form involved). *See, e.g., Oksanen v. Page Memorial Hosp.*, 945 F.2d 696 (4th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992).

Following the Supreme Court's guidance in *Copperweld*, this Court concludes that the Defendants are legally incapable of conspiring and that judgment as a matter of law in favor of the Defendants on this issue is appropriate. While the MAPGA is not a wholly-owned subsidiary of the PGA and these entities are separately incorporated, the evidence at trial established that as pertinent to this case the PGA and its member sections function as a single economic unit with the PGA possessing ultimate control over the actions of individual sections.

The Court finds it significant that the sections are governed by the PGA Constitution, by policies adopted either at PGA annual meetings or by the PGA Board of Directors, and by other pertinent policy documents, such as trademark licensing agreements. *See Williams v. I.B. Fischer Nevada*, 794 F.Supp. 1026, 1032 (D.Nev.1992) ("The threshold requirement of concerted activity is missing among multiple corporations operated as a single entity when corporate policies are set by one individual or by a parent corporation."), *aff'd*, 999 F.2d 445 (9th Cir. 1993).

---

2. The Court addresses Counts 2 and 3, tortious interference with contractual or prospective business relations, in its discussion of the punitive damages award.

3. The same result applies under the federal or state antitrust statutes. Section 11–204(a)(1) of the Maryland Antitrust Act indicates that courts are to be "guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." *Md. Code Ann.Comm.Law* II § 11–204(a)(1) (1990 Repl.Vol.).

It is true that each section maintains its own revenues, has its own by-laws, elects its own officers and often conducts programs intended to benefit members of that section only. The sections' actions, however, must be approved by the PGA to ensure that they are in the best interests of the organization as a whole. For example, when the MAPGA sought to enter into a credit card program for its membership, the PGA vetoed it because it conflicted with a program the PGA had in place to benefit the organization as a whole. More importantly, when the MAPGA sought to enter into the Contract and its amendments with Seabury, the PGA had to approve these actions.[4] This type of "ability to control" is perhaps the determinative factor in the *Copperweld* analysis. *See* Philip Areeda, VII *Antitrust Law* ¶ 1467f, at 267 (1986) ("[*Copperweld's* ] stress on the power to control as distinct from its day-to-day exercise seems equally apt when ownership is not totally in common.")[5]

■ Based on the evidence presented at trial and the dictates of the Supreme Court in *Copperweld*, this Court finds that the PGA and its member sections, as a matter of law, are not capable of conspiring in violation of the antitrust laws.[6] Accordingly, the Defendants are entitled to judgment as a matter of law on Counts 7 and 12.

## C. The GMDA Conspiracy

Seabury claims that the PGA and the GMDA, an association of exhibitors, entered into an illegal conspiracy to limit the number of golf trade shows and to restrict non-PGA, third-party involvement in these shows, an agreement which restrained competition in violation of the antitrust laws.

Seabury argued that its East Coast Show was contrary to the financial interests of both the PGA and the GMDA and offered a document mentioning the PGA's concern that the growth of regional shows could "erode vendor dollars." Pl.'s Ex. 206, at 4. There was also evidence of the PGA's desire to control all national golf trade shows. In one document, the PGA states: "We believe there is an opportunity to operate up to three highly successful national trade shows and eliminate all other regional Section shows. One show would be conducted on the east coast." Pl.'s Ex. 83. In another document summarizing the activity of a September 11, 1990 meeting at Dulles airport, Rod Thompson wrote, "[The] PGA wants total control of all golf shows!" Pl.'s Ex. 278.

In addition, the PGA had discussed the significant concerns on the GMDA's part about the proliferation of golf trade shows and the lack of PGA involvement. Pl.'s Ex. 83.[7] The PGA was also aware that the GMDA "felt comfortable dealing with the PGA in the production of shows." Pl.'s Ex. 84. And at the famed "Basement Meeting," Jesse Holhouser, Deputy Executive Director and Chief Financial Officer of the PGA, "stressed the unification of PGA and GMDA on all shows." *Id.*

4. In this instance, while the PGA did approve the contract, it was Dan Daniels, in his capacity as PGA general counsel, who approved the contract immediately prior to resigning from the PGA to go to Seabury.

5. Seabury points to the fact that at one point the MAPGA refused PGA's request for information because the information sought was proprietary to the MAPGA. *See* Defs.' Ex. 73. There were also allegations that the MAPGA was denied a request to view PGA's exhibitor waiting list because the waiting list was "proprietary." That a parent company would keep information from its subsidiary is not as troublesome to the Court as a subsidiary keeping information from the parent company; controlling information from the top down is consistent with a parent exercising control over a subsidiary.

6. Seabury presented evidence at trial that the PGA purchased the International Golf Show ("the West Coast Show") from the Southern California section. While it is true that the PGA did not simply pay a token sum for the purchase of the Show, there were several unrebutted reasons offered by the PGA for pursuing the transaction: (1) to be fair to the Southern California section members, who had developed the Show and (2) to support the Section's programs which had become dependent on revenues from the Show. Even assuming that the PGA made the payment to purchase an asset from the section, the fact remains that the PGA always had ultimate control over the section, which could not function as a section independent of the PGA.

7. "Recent discussions with GMDA indicate significant concerns about proliferation of Shows and lack of PGA involvement."

In reviewing the evidence presented with regard to this conspiracy, the Court is mindful of the Supreme Court's statement in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) that

> antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 [conspiracy] case.... [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.

*Id.* at 588, 106 S.Ct. at 1356 (citations omitted).

██ With this standard in mind, the Court finds that there is insufficient evidence to support a jury finding that the PGA and the GMDA conspired. None of the evidence offered by Plaintiff, including that discussed above, establishes that the GMDA and Defendants *agreed to act together* either to control the number of successful golf trade shows or to eliminate third-party involvement, like Seabury, in golf trade shows. At no time did Plaintiff produce evidence that the GMDA did more than voice the concerns and preferences of its membership or that the PGA acted in response to the complaints and concerns of its customers. There is similarly no evidence that the PGA requested any action on the part of the GMDA. In essence, there is no evidence of any illegal agreement between the PGA and the GMDA.

Accordingly, judgment as a matter of law shall be entered for the Defendants on Counts 7 and 12 with regard to that part of the jury's verdict finding that the PGA and the GMDA conspired to illegally restrain trade.

## D. Monopolization Claims

██ To prevail on a monopolization claim, a plaintiff must demonstrate possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner and causal injury. *See Advanced Health–Care Services, Inc. v. Radford Community Hosp.*, 910 F.2d 139, 147 (4th Cir.1990). For attempted monopolization, the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive behavior, and a high probability of successful monopolization. *Id.*

### 1. Relevant Market

The Defendants assert that they are entitled to judgment as a matter of law or a new trial on the monopolization claims because the evidence did not establish Plaintiff's market definition of "large golf merchandise trade shows" or that such a product market, if it exists, should be limited to the PGA Orlando Show and Seabury's East Coast Show.

██ The determination of a relevant market is a question of fact. *See International Boxing Club v. United States*, 358 U.S. 242, 245, 251, 79 S.Ct. 245, 247–48, 250–51, 3 L.Ed.2d 270 (1959); *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956). Thus, the issue presented is whether Plaintiff produced adequate evidence to support a jury finding that (1) the goods and services provided by golf trade shows are sufficiently distinct from marketing and distribution alternatives to constitute a relevant product market and (2) that such a market should include only the PGA Orlando Show and Seabury's East Coast Show.

Plaintiff describes the market at issue as the production of golf trade shows for professional golf buyers and their suppliers. Plaintiff further asserts that golf trade shows provide an opportunity for golf manufacturers and distributors to market their equipment and apparel to golf professionals and other buyers for later resale to the general public as well as to introduce new lines of golf equipment and apparel. A significant amount of the concentrated marketing of golf equipment and apparel occurs at golf trade shows. (Daniels Aff. ¶ 4.)

At trial, Plaintiff presented evidence distinguishing golf trade shows from other alternative methods of marketing and distrib-

uting golf equipment and apparel, including direct mail, door-to-door and catalog sales. Besides having the advantage of gathering together multiple retailers under one roof, golf trade shows offer a wide variety of "services," including business seminars, product demonstrations, apparel fashion shows, meeting opportunities and the ability to "network." *See* Martin Tr. at 24–26, 176; Maxwell Tr. at 19–20; Larner Tr. at 66–70. Thus, the package of products and collateral services present at a golf trade show is different from and appeals to buyers in a manner distinct from the sale of the various individual products when sold separately.

■ This Court does not believe that Plaintiff's evidence on the relevant market would have been inadequate to establish a relevant market including golf trade shows, and maybe even golf trade shows over a certain size (appropriately defined). Certainly, a level of expertise is needed in producing trade shows, whether it is for golf or any other sport, and the evidence establishes that trade shows provide sufficient collateral services that manufacturers and distributors desire to participate in these shows despite alternative channels of distribution.[8] In fact, at least one other court has accepted a market definition as the production/sponsorship of an industry trade show. *See Expoconsul Int'l, Inc. v. A/E Systems, Inc.*, 711 F.Supp. 730 (S.D.N.Y.1989) (building design and construction industry; accepting market definition without discussion). Accordingly, the Court finds that Plaintiff, as a matter of law and under the standard for a new trial, has established the relevant product market definition as golf trade shows.

■ However, Plaintiff has sought to narrow the relevant market very substantial-ly in order to establish its monopolization claims. Seabury contends that the golf trade show market for purposes of its suit should be limited to the PGA's Orlando Show and Seabury's East Coast Show. Plaintiff's expert, Dr. Martin, excluded at least fifteen sectional golf trade shows as well as the International Golf Show ("the West Coast Show") in arriving at his market definition. Because Plaintiff has failed to produce sufficient evidence to justify excluding these regional and national golf shows, all of which provide the collateral services Plaintiff points to as distinguishing golf trade shows from other methods of marketing and distribution, the Defendants are entitled to judgment as a matter of law.

Apart from Dr. Martin's often conclusory and factually unsubstantiated opinions, Plaintiff has come forward with no evidence to support the exclusions. As the Supreme Court recently noted:

> When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury verdict.... Expert testimony is useful as a guide to interpreting market facts, but is not a substitute for them.

*Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, — U.S. —, —, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993).

With regard to the sectional shows, some of Dr. Martin's statements are simply conclusory pronouncements. *See* Martin Tr. at 19.[9] When Dr. Martin did attempt to offer reasons for excluding sectional shows as ineffective competitors he was merely expressing his personal, unsubstantiated opinion.[10] In

---

8. The PGA's exhibitor waiting list evidences manufacturers' and distributors' desire to participate in golf trade shows despite the fact that booth prices, which continued to increase every year, were thought to be "very expensive." Vincent Tr. at 62. Notably, both the PGA Orlando Show and the West Coast Show are able to maintain extensive waiting lists, despite complaints by exhibitors of "price gouging." Pl.'s Ex. 226. This evidence tends to show that pricing at golf trade shows is inelastic and that the booth prices charged by the PGA have no real effect upon demand, facts which support a finding of a relevant product market.

9. "[T]hey're not really effective competitors, effective in the sense that they really don't provide the kind of competition to the large national and regional shows that the kind of competition that would cause those other shows to do—to act differently because the sectional shows are around."

10. For example, Dr. Martin opined that PGA rules limiting sectional shows to their boundaries meant that such shows "really service the exhibitors that are ... located within [those] boundaries and the employees that are located within the boundaries," and that sectional shows are

short, Plaintiff submitted no evidence on the number of booths, volume of sales or other indicia of the size and scope of sectional shows (i.e., exhibitor/attendee lists) that would support the conclusion that sectional shows are not effective competitors in the golf trade show market.[11]

Dr. Martin's exclusion of the West Coast Show suffers from the same infirmities. When asked to give his reasons for excluding the West Coast Show from the relevant market, Dr. Martin testified that "[t]he record really shows—the evidence really shows that it doesn't—that it doesn't compete." *Id.* at 21; *see also id.* (stating that the West Coast Show "does not attract people, that is, attract buyers, in any significant numbers from the East Coast."). However, apart from deposition testimony from Mr. Sandefur that "he doesn't believe it does compete," *id.*, neither Dr. Martin nor Plaintiff cites to anything (attendance lists, surveys, etc.) that would provide an adequate evidentiary basis for Dr. Martin's opinion that the West Coast Show should be excluded from the market.

Furthermore, undisputed testimony from other witnesses contradicts and renders unreasonable Dr. Martin's opinion that the sectional shows and the West Coast Show do not compete with the PGA Orlando Show and Seabury's East Coast Show. Robert Maxwell of the Marriott Corporation, a frequent participant in golf trade shows, testified that "[s]ection shows, the East Coast show, the West Coast Show, Orlando Show, they all compete with one another for the attention of professionals to come and buy." Maxwell Tr. at 61. Maxwell also noted that he went to some sectional shows, including the North and South Texas Show. *Id.* James Vincent,

national sales manager for Cobra Golf, testified that he attended over 100 golf shows yearly, and "[o]ver the years, the more successful shows in the northwest, truthfully the West Coast Show ..., Denver, Salt Lake City, Dallas, New York, Boston, Florida, show in Carolina, so on a national basis, certainly." Vincent Tr. at 12. Even Seabury seemed to think that it was in competition with such shows, as indicated by its mailing to 2,000 golf industry executives advertising Seabury's first show, which stated: "[Y]ou will no longer have to exhibit at several regional shows." Pl.'s Ex. 26.

Thus, because Dr. Martin's opinion that the sectional shows and West Coast Show should be excluded from the market is not supported by sufficient, much less any evidence, and since substantial record evidence provided by actual participants in the golf trade show market contradicts it, Dr. Martin's opinion that the market should include only the PGA Orlando Show and Seabury's East Coast Show cannot support a jury verdict.

The absence of an adequate market definition makes it impossible to approximate the PGA's share of the relevant market, the first step in any antitrust analysis under § 2.[12] *See White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104 (4th Cir.1987) (to prove monopolization, plaintiff must show that defendant possesses monopoly power in relevant market). Consequently, the Defendants are entitled to judgment as a matter of law on Counts 4, 5, 6, 9, 10 and 11.

### 2. *Copperweld*

■ The second element of a § 2 Sherman Act claim requires Plaintiff to prove that

---

therefore, much smaller operations. Martin Tr. at 19–20. Dr. Martin, however, referred to no evidence in support of his conclusion.

11. In fact, the only concrete evidence on this issue contradicts Dr. Martin. *See* Maxwell Tr. at 60 (testifying that would not be surprised if show conducted by the Pacific Northwest Section had just as many exhibitors and buyers of the East Coast Show), 61 (stating that North and South Texas Show "certainly draws very good attendance with respect to attendees and manufacturers.").

12. Plaintiff stated at argument on the Defendants' post-trial motion that the issue of whether or not the sectional shows and the West Coast Show should have been included is irrelevant, given that the PGA has market power even if these other shows are included. Plaintiff may be right, although it presented no evidence at argument to support such a bold and significant conclusion. Even so, the fact that Plaintiff submitted no evidence *at trial* on the size of these other shows or their ownership renders the jury verdict invalid because the jury did not have the opportunity to establish the PGA's market share in a market that included such shows.

the Defendants exercised monopoly power to exclude Seabury from the relevant market. However, as this Court acknowledged at the summary judgment stage, it is not an exercise of monopoly power to actively protect the licensing and use of a properly-registered trademark. Memorandum and Order·of Dec. 1, 1992, at 13–14; *see also Sun Dun, Inc. v. Coca–Cola Co.,* 740 F.Supp. 381, 393–94 (D.Md.1990). Thus, any finding of monopolization or attempted monopolization based on the PGA's refusal to license Seabury to use its own trademark is precluded as a matter of law.

■ Accordingly, at trial Plaintiff contended that the PGA's unlawful exercise of monopoly power consisted of preventing the MAPGA from licensing its "separately registered" trademarks to Seabury. However, the Court's finding that the PGA and the MAPGA are a single economic entity under *Copperweld,* over which the PGA exercises ultimate control, prevents a finding that the PGA engaged in monopolistic behavior. The MAPGA's trademarks (one of which explicitly·references the PGA name and logo) are, given the *Copperweld* determination, "assets" of the PGA over which the PGA has control. The PGA's action in preventing the MAPGA from licensing its trademarks is thus no more actionable as an antitrust violation than the PGA's refusal to license a PGA trademark. Accordingly; the Defendants are entitled to judgment as a matter of law on the monopolization and attempted monopolization counts on this alternate ground.

### E. The Compensatory Damage Award

The jury awarded a total of $2.6 million in compensatory damages for all contract and antitrust claims. The Defendants argue that this award should be set aside as a matter of law because Plaintiff did not sufficiently establish damages, in this amount or any other, or, in the alternative, a new trial awarded. The Defendants argue that $2.6 million is an inappropriate measure of Seabury's lost value for a business which operated for two years at different dates and locations, had gross revenues decline by 25% in its second year of business and had a loss in its second year of business.[13]

■ At the outset, the Court notes that the $2.6 million figure is grossly excessive. In fact, it is $300,000 greater than the highest estimate put forth by Plaintiff's expert.

■ Plaintiff is correct when it states that a jury is permitted to consider all the evidence in the record when calculating damages and that a damage award should not be overturned on the basis of speculation as to the manner in which the jurors arrived at it. However, there must be evidence in the record to support the verdict. *See Klein v. Sears, Roebuck and Co.,* 773 F.2d 1421, 1428 (4th·Cir.1985) (trial court may set aside verdict if it is "so excessive that is cannot be justified by anything in the record or of which the court can take judicial notice"); *Mid–West Underground Storage, Inc. v. Porter,* 717 F.2d 493, 501 (10th Cir.1983) (damage award will be upheld if within the range of evidence admitted); *Narcisse v. Illinois C.G.R. Co.,* 620 F.2d 544, 548 (5th Cir. 1980) (verdict upheld because was "within the universe of possible awards which are supported by the evidence").

At argument, Plaintiff's counsel could not offer any principled explanation as to how the jury could have reached its verdict from the evidence presented to it. The Court, despite its own thorough review of the record, similarly cannot find any basis for the jury's "off the charts" verdict. Because the jury's verdict is not within the "universe of possible awards which are supported by the evidence," it must be set aside.

■ The Court has considered the possibility of remittitur. However, the Court finds that Plaintiff has failed to establish *any* amount of damages to a reasonable degree of

---

13. The Court does not agree with the Defendants' argument that Seabury would be entitled to only the lost profits of the cancelled 1992 East Coast Show. The Defendants reason that the jury's verdict, if left intact, indicates Seabury was entitled to put on a MAPGA-sponsored show in Atlantic City. Then, according to the Defen-

dants, Seabury could still produce the 1993–1995 golf trade shows and has simply abandoned the venture. The contractual relationship, however, has been fundamentally altered and the contract breached. Seabury is entitled to choose its remedy and is not now required to work with the breaching party.

certainty, thereby providing no basis for remittitur.

■ First, Plaintiff's methods for estimating its compensatory damages are insufficient as a matter of law. Once liability is established, a reasonable estimate may be used to prove the amount of damage where such a measure is ordinarily difficult. *A.W.G. Farms v. Federal Crop Ins. Corp.*, 757 F.2d 720, 729 (8th Cir.1985). However, Plaintiff has failed to produce evidence showing that any of its methods of calculating damages are reasonable.

The "direct profits" method offered by Plaintiff, involving a disingenuous, manipulative and scientifically unacceptable calculation, generates a meaningless and artificial number, and is thus useless.[14] The "discount cash-flow analysis" performed by Plaintiff's expert is also invalid, due to Plaintiff's failure to subtract significant ordinary and necessary operating expenses.[15] And Plaintiff's damage calculation which uses a wholly irrelevant multiple generated from the earnings and stock prices of a publicly-traded company in England (the "Blenheim multiplier") is preposterous.

In arriving at its damage estimate, Plaintiff utilized two other methods, which in turn made use of: (1) an average annual growth rate derived from years seven through thirteen of the West Coast Show and (2) the multiple that the PGA paid the Southern California Section for the West Coast Show when the PGA bought the Show in its thirteenth year of business. The growth rate and/or multiplier was applied to the gross receipts of Seabury's show in 1991, its second year of operation, and to an average of Seabury's 1990 and 1991 gross revenues from the two shows.[16]

■ The growth rate derived from the West Coast Show, which excluded the first six, base-building[17] years of its existence, as well as the multiplier derived from the sale of the second largest golf trade show in the world in its thirteenth year of operation with revenues of over $1.5 million, cannot, as a matter of law, be a "reasonably comparable" yardstick[18] with which to estimate damages for Seabury's two-year operation that had a substantial net loss.[19] The comparison between Seabury's fledgling

---

14. In essence, under this method, Plaintiff's expert, Dr. Rey, arbitrarily subtracted certain expenses, but not others, from the gross revenues of the West Coast Show to come up with that show's "direct profits." The ratio between the price paid by the PGA for the West Coast Show and the Show's "direct profits" generated a multiplier, which Dr. Rey then applied to Seabury's "direct profits," calculated in the same fashion. Given Plaintiff's inability to explain why Dr. Rey left out certain expenses when calculating direct profits, it is apparent that Dr. Rey manipulated the calculations and in fact "invented" the concept of "direct profits" in order to make Seabury, a corporation showing no net profits, and actually operating at a loss, look like it had a profit. The West Coast Show, no matter which way you calculated it, would always show a profit. Thus, the direct profits calculation produces a meaningless number.

15. At argument, Plaintiff's counsel could not provide a complete list of which expenses were taken into account in the calculation of Seabury's profit forecast and which were not. However, based on those expenses which Plaintiff's counsel conceded were not taken into consideration, it is apparent that the cash-flow analysis is fatally flawed.

16. The growth rate was also used in the discount cash-flow analysis.

17. *See* Maxwell Tr. at 53 (stating that the first six years of the West Coast Show gave it a "fairly stable base" and that there was "no question that [it] ... became some of the foundation that has made [the West Coast Show] successful").

18. Under Maryland law, a plaintiff may use a "yardstick" measure of proving its damages, as long as its assumptions rest on adequate bases and there is a "reasonable compatibility" between the businesses. *See Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft*, 828 F.2d 1033, 1044 n. 21 (4th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1753, 100 L.Ed.2d 215 (1988).

19. *See, e.g., Handley v. Guasco*, 165 Cal.App.2d 703, 332 P.2d 354, 360 (1958) ("[T]o base prospective profits of a business in a completely new location and city upon the experience of an old established business elsewhere would be highly speculative."); *Belcher v. Import Cars Ltd.*, 246 So.2d 584, 587 (Fla.Dist.Ct.App.) (established car dealership not comparable to new car dealership), *cert. denied*, 252 So.2d 801 (Fla.1971); *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 112 A.2d 901, 904 (1955) (refusing to permit plaintiff to establish damages for start-up period by using profits that same business earned in later period); *Plummer v. Fogley*, 363 P.2d 238, 242 (Okla.1961) (cannot compare experienced business to inexperienced business).

business, operating at, if not below the line and the established, profitable operations of the West Coast Show is simply unreasonable.[20] Furthermore, the financial data to which the growth rate and multiple were applied do not appear to be correct or consistent.[21] Consequently, these final two methods offered by Plaintiff to prove its damages are invalid as a matter of law.

Even if the Court were to ignore Plaintiff's proffered calculations, given the financial information in the record regarding Plaintiff's operations, any attempt to estimate Plaintiff's projected profits, much less whether Seabury would ever realize profits under the Contract, or the value of Seabury's business as a going concern would require that the Court improperly engage in speculation and conjecture.[22] Between the 1990 and 1991 shows, Seabury's exhibitors declined from 269 to 193 and gross revenues declined from $399,000 to $293,000. (Rey Tr. at 79.) Seabury, as a corporation, experienced a loss of $136,000 in 1989. And, financial statements for 1991 show that Seabury as a corporation had a loss of $32,000. (*Id.* at 83, 89.) There is simply no basis for concluding that Seabury would have realized any profits had the MAPGA not breached the contract and even if it would, what they would be. Nor is it possible to estimate Seabury's "going concern" value from the evidence produced.

The jury's $2.6 million verdict cannot be justified by anything in the record. Consequently, it must be set aside. In addition, because Plaintiff is unable to point to any valid method of calculating damages or to any evidence in the record which would support a reasonable estimate of damages, there is no basis for remittitur. In short, Plaintiff has failed to satisfy its burden of establishing any damages with "reasonable certainty." [23] Accordingly, the Defendants are entitled to judgment as a matter of law.[24]

## F. The Punitive Damage Award

Although convinced that the Defendants were entitled to judgment as a matter of law

---

20. Plaintiff claims in attempting to establish comparability that Seabury and the West Coast Show operating with comparable profits margins. However, in support of this claim, Plaintiff compares its "direct profits" from the 1991 East Coast Show, which as previously noted fail to take into account significant expenses, with the West Coast Show's actual profits. Seabury had no net profits from the 1991 Show, and in fact lost between $20,000 and $75,000 that year. It is thus clear that Plaintiff's claim regarding the comparability of the East and West Coast Shows' profit margins is incredible.

21. The Court also notes that using the multiple paid for the West Coast Show in its thirteenth year of operation would generate an inaccurate damage number. If usable at all, the multiple should have been discounted for one year given that the Seabury contract was only for five years and the multiple derived from the West Coast Show's thirteenth year is six years from the date from which calculation of the growth rate began.

22. *See, e.g., LaVay Corp. v. Dominion Federal Savings & Loan Ass'n,* 830 F.2d 522, 529 (4th Cir.1987) ("Damages may not be awarded ... where an award would be based on an estimate of lost profits which is speculative.") (citing *Restatement (Second) of Contracts* § 352 (1979)), *cert. denied,* 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988).

23. *See John D. Copanos & Sons v. McDade Rigging & Steel Erection Co., Inc.,* 43 Md.App. 204, 206, 403 A.2d 402, 404–05 (1979); *United States*

*Life Ins. Co. v. Mechanics and Farmers Bank,* 685 F.2d 887, 895–96 (4th Cir.1982).

24. Finally, although the jury's finding that the Defendants breached the Contract might permit an award in the amount of $1.00 as nominal compensatory damages, the Court's doubts concerning the propriety of setting damages by granting judgment as a matter of law compels it to exercise its discretion and deny Plaintiff nominal damages. If a $1.00 nominal damage award were to be viewed by the appellate court as a remittitur of damages, the Court would be required to offer Plaintiff the option of a new trial on damages. *See Brown & Williamson Tobacco Corp. v. Jacobson,* 644 F.Supp. 1240, 1263 & n. 16 (N.D.Ill.1986) (setting aside compensatory damage award of $3 million and entering judgment in favor of plaintiff for $1.00 as nominal damages; however, offering option of remittitur/new trial should appellate court conclude that it is improper to set damages by granting JNOV), *aff'd in part, rev'd in part,* 827 F.2d 1119 (7th Cir.1987) (not addressing issue), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). Because Plaintiff has utterly failed to prove that it sustained any damage as a result of the Defendants' breach or the extent of any such damage, a new trial on damages would be fruitless. Accordingly, the Court finds that Plaintiff's failure to establish *any* amount of damages requires that the jury verdict be set aside in its entirety and judgment entered in favor of the Defendants as a matter of law that there were no damages at all.

on Seabury's punitive damages claim, the Court permitted the issue to be presented to the jury as a matter of judicial economy.[25] At trial, the jury awarded Seabury $4.8 million in punitive damages.

In this case, the tort of intentional interference with a contractual relationship was the only asserted predicate for Seabury's punitive damages claim. The parties stipulated that the PGA would be liable for any damages awarded against the MAPGA. Accordingly, it was not necessary to submit a jury question regarding the tort itself. For, the compensatory damages for the tort would, inevitably, be the same as the damages for the breach of contract. And, because of the stipulation, it was not necessary to establish the commission of the tort to hold the PGA liable for those compensatory damages. Therefore, as a procedural matter, the instructions regarding the tort were subsumed in the instructions and question regarding punitive damages.

In analyzing the verdict to see if the punitive damages verdict can stand, it is necessary to determine whether the jury properly could find that the tort had been committed and that the standards for punitive damages had been met. As discussed below, the Court concludes that the jury properly could have found neither. That is, by virtue of the qualified privilege, discussed below, the tort was not committed. Moreover, even if the tort had been committed, Seabury has failed to establish the malice necessary to sustain a punitive damages award.

### 1. Tortious Interference—Qualified Privilege

▉▉▉▉ A parent corporation has a privilege to interfere to protect its economic in-

terests absent clear evidence that the parent employed wrongful means or acted with an improper purpose.[26] To determine whether interference in a given case is proper, the court must examine a number of factors and decide "whether, upon consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." *Restatement (Second) of Torts* § 767 cmt. b (1979). Those factors include "(a) the nature of the actor's conduct, (b) the nature of the expectancy with which his conduct interferes, (c) the relations between the parties, (d) the interest sought to be advanced by the actor and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Id.* The Court finds that the PGA and the MAPGA are in a relationship which was effectively that of a parent corporation and its subsidiary and that the PGA's actions were proper and within the scope of the qualified privilege.[27]

There has been no suggestion that the PGA used any improper means to get the MAPGA to breach its contract with Seabury. Seabury has, however, argued that the PGA acted with the improper purpose of "taking Seabury out." (Seabury's Resp. to Defs.' Post–Trial Mot. at 32, 36.)

The Court finds, that while the parties may dislike each other, the PGA acted to protect its business interests. The PGA had a long-standing policy not to allow its sections to license their names, initials and/or logos or to otherwise endorse third-party services or products without PGA approval and also required sections to sponsor events within their territorial boundaries. *See, e.g.,*

**25.** The jury might have resolved the issue for the Defendants. Since it did not, in the event that the appellate court concludes that this Court should not have given the Defendants judgment as a matter of law, a new trial might not be necessary.

**26.** "Commonly included among improper means are violence, threats or intimidations, deceit or misrepresentation, bribery or defamation." *Chase v. Weight,* Civ. No. 87–570–FR, 1988 WL 107051, *2 (D.Or. Oct. 12, 1988) (citations omitted). None of the improper means are at issue in this case.

**27.** The Court previously determined, as part of its antitrust analysis, that the PGA and the MAPGA are part of a single economic unit with the PGA having the ultimate control over the MAPGA's actions. A finding that two entities are unable to conspire under the antitrust laws, however, does not require a finding that one cannot interfere with the contractual relationship of the other. The relationship between the two though, may afford the "parent" a privilege to interfere with the contracts of its "subsidiaries."

Pl.'s Ex. 83 ("Section entered into an agreement that is both illegal and in violation of PGA policy. This must be corrected. There is no way to correct this as long as Seabury owns the Show. The PGA is not interested in providing a third party with the use of its logo or initials to conduct a Show."); Pl.'s Ex. 91 ("We agree that it would have been in the best interests of the Association and our Members if the Section had approached us about the proposal rather than entering into an agreement with a third party without our knowledge. Rather than focusing on why this happened, however, we agreed to pursue a remedy that would be in everyone's best interests.").

The PGA was entitled to approve or disapprove the actions of its sections and to enforce the Section Guidelines to make sure that the goals of the PGA as a whole were furthered. The PGA simply required the MAPGA to follow the Section Guidelines and to abide by the PGA's interpretation of the contract. The evidence consistently indicates that the PGA, and many officials of the MAPGA, understood the contract to require Seabury to hold the East Coast Show within the MAPGA's boundaries while Seabury believed otherwise. *See* Majewski Tr. at 28–29 (MAPGA President when the contract was signed); Pl.'s Ex. 74 (Rod Thompson's statement); Pl.'s Ex. 161; Pl.'s Ex. 162. While the result of this understanding was a breach of contract by the MAPGA, this action does not simply turn into a tort action because the PGA, as was its right, directed the MAPGA to breach its contract with Seabury.

█ In short, the PGA cannot be held to have interfered with the contracts of the MAPGA because the PGA was entitled to approve or disapprove of contract actions taken by the MAPGA. Having discovered

that the MAPGA entered into an agreement against the PGA's best interests and that this agreement was approved by Dan Daniels immediately prior to his employment with Seabury, the PGA was entitled to instruct MAPGA, as a subordinate unit, to break its contract. The PGA acted with the confines of the qualified privilege a parent organization may exert over a subsidiary to protect its own financial interests and did not engage in tortious behavior. *See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals Inc.*, 862 F.2d 597 (8th Cir.1988) (holding that a parent corporation was, in effect, the same entity as its subsidiary and was, therefore, privileged to become involved in the relations between the subsidiary and a third party).[28]

### 2. Clear and Convincing Proof of Actual Malice

█ Even if the tort had been established, the evidence does not permit a punitive damages award. The punitive damage standards have been recently articulated in *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992) and *Schaefer v. Miller*, 322 Md. 297, 319–20, 587 A.2d 491, 502–02 (1991).[29] "In a tort case where punitive damages are permitted, in order to obtain such an award a plaintiff must prove actual malice or its legal equivalent." *Schaefer*, 587 A.2d at 492. With regard to interference with contractual relations, the tort at issue in this case, under Maryland law, the plaintiff must establish the existence of actual malice for there to be an award of punitive damages. *Id.* at 501. "Actual or express malice . . . has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Id.* at 492–93.[30] As "in *any* tort case a plaintiff must

---

28. Contrary to Plaintiff's assertion at argument, the parent/subsidiary privilege has been held applicable to tortious interference with an existing contract, and is not limited to interference with prospective business relations. *See Canderm,* 862 F.2d 597; *MNC Commercial v. Park Jensen Co.,* Civ. No. HAR–90–1055, 1991 WL 74137 (D.Md.1991) (permitting secured creditor to interfere with debtor's existing contracts); *Bendix Corp. v. Adams,* 610 P.2d 24, 29–30 (Ala.1980).

29. *Zenobia* articulated the relevant legal standards for the award of punitive damages in nonintentional tort cases and cited with approval *Schaefer* for the standards applicable to intentional tort cases, such as tortious interference with contract. *Zenobia,* 601 A.2d at n. 21.

30. The Defendants argue that Seabury had to prove that "the PGA actually knew that Seabury had the contractual right to have its 1992 or subsequent trade shows in Atlantic City." (Defs.' Mot. for J. As A Matter of Law Or, In the Alterna-

establish by clear and convincing evidence the basis for an award of punitive damages." *Zenobia,* 601 A.2d at 657 (emphasis in original).

■■■ In the present case, Seabury did not establish actual malice under the clear and convincing evidence standard. The evidence at trial consistently indicated that the PGA, and many officials of the MAPGA, simply held a different contract interpretation than did Seabury and understood the contract to require Seabury to hold the East Coast Show within MAPGA boundaries while Seabury believed otherwise. *See* Majewski Tr. at 28–29 (MAPGA President when the contract was signed); Pl.'s Ex. 74 (Rod Thompson's statement); Pl.'s Ex. 161; Pl.'s Ex. 162.[31] In fact, Plaintiff's Exhibit 152 indicates that the PGA sought legal advice from both in-house and outside legal counsel before taking the position that the contract with Seabury contemplated a show within the MAPGA's territorial boundaries. While the evidence indicates that the PGA was aware of a dispute over contractual interpretation and may have disliked Seabury management, a difference in interpretation alone is insufficient to establish actual malice under the clear and convincing standard. A basic but justified disagreement regarding the terms of the contract does not support an award of punitive damages.[32]

■■■ Furthermore, much of Seabury's evidence in support of its actual malice claim is ambiguous and can just as easily support a finding that the PGA was acting to protect its own business interests.[33] Actions taken to protect one's legitimate economic or business interests does not constitute proof of actual malice. *See, e.g., Glass Design Imports, Inc. v. Import Specialties,* 867 F.2d 1139, 1144 (8th Cir.1989) ("Legal malice for purposes of imposition of punitive damages arises when there is intentional doing of a wrongful act without just cause or excuse."); *Composite Marine Propellers v. Van Der Woude,* 962 F.2d 1263, 1268 (7th Cir.1992) (reversing punitive award and noting the "uncharitable" and "unforgiving" nature of competition). The Court does not find the evidence adequate to support a punitive damages award.

## G. Legal Fees and Costs

Paragraph 9 of the Contract provides, in relevant part, that

[i]n the event any action or proceeding is brought by either party against the other party under this Agreement, the prevailing party shall be entitled to recover the court

tive, for A New Trial at 30–31.) This is not the standard applicable to a punitive damage award in an intentional tort action.

31. Plaintiff did introduce a December 1991, letter from MAPGA President Holley to Mr. Awtrey asserting that the contract did not place any limits on Seabury's right to select the show location. This evidence is contradicted by: (1) a letter written by MAPGA counsel Nemeroff one year earlier stating that "the contract clearly contemplates a show within the geographical boundaries of the MAPGA," Pl.'s Ex. 73; and (2) Mr. Awtrey's response to Mr. Holley's letter stating the PGA's disagreement with Mr. Holley's conclusions, which were based on legal advice received by the PGA. Pl.'s Ex. 152.

32. It is well settled law in Maryland that punitive damages may not be awarded in a pure breach of contract action. *Schaefer,* 587 A.2d at 492.

33. For example, Pl.'s Ex. 80 states:

1) First choice of PGA of America—terminate contract between MAPGA and Seabury at all costs. Described as thermo nuclear!

2) Show can continue in our Section. We can use any logo and PGA will approve a licensing agreement for Seabury to use our logo (PGA of America).

3) Show can go on in Atlantic City, NJ in 1991 with no logos or reference to PGA (Seabury alone)

While this document indicates that there were hostile feelings between the PGA and Seabury, it also is ambiguous enough to indicate that the PGA was concerned with protecting its trademarks and making sure these marks were not used in conjunction with events violating the PGA Section guidelines. *See also* Dickey Tr. at 56–57 (where Dickey testified that Mr. Awtrey "was going to try to take the show out" but never discussed how this was to happen or the basis for this statement); Anderson Tr. at 31–32 (discussing Mr. Awtrey's desire to "take out" competition without directing that desire towards any one entity); Pl.'s Ex. 83 (where discussion indicated that the show would be better business for the Defendants if there was no third party involvement: "Q: Can we live with Seabury involvement through 1991 or 1992? A: No; however, probably could if we owned show. Makes much more sense for them to leave.").

costs and fees of its attorney in such action or proceeding ... in such amount as the court may ajudge [sic] reasonable as attorney's fees.

■ Consequently, since Seabury has "prevailed" on its breach of contract claim against the Defendants, it is entitled to the court costs and reasonable attorney's fees incurred in prosecuting its breach of contract action.

### IV. *Conclusion*

For the foregoing reasons, Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, for New Trial is

**GRANTED IN PART AND DENIED IN PART:**

1. The Defendants are entitled to judgment as a matter of law with regard to all Counts except Count 1.

2. The Defendants are entitled to judgment as a matter of law with respect to the absence of any compensatory damages associated with Count 1.

3. The Plaintiff is entitled to recover its fees and expenses incurred in regard to the breach of contract.

    a. The parties shall make a good faith effort to stipulate to the amount of such fees.

    b. Any such stipulation shall be without prejudice to any party's appellate rights with regard to any other issues.

    c. Absent a stipulation as to the amount of fees/costs by May 15, 1994, counsel for Plaintiff shall arrange a telephone conference with the Court to schedule the ADR or trial procedures to be utilized to resolve the amount of fees/costs to be awarded.

    d. Please note that in the absence of a stipulation/settlement, there should be no disclosure to the Court of the settlement positions of either side as to the amount to be awarded.

**SO ORDERED.**