TYGER CONSTRUCTION COMPANY INCORPORATED, a South Carolina Corporation, individually and for the use and benefit of Tyger–Pensacola Joint Venture, Plaintiff–Appellant,

v.

PENSACOLA CONSTRUCTION COMPANY, a Delaware Corporation, Defendant–Appellee.

TYGER CONSTRUCTION COMPANY INCORPORATED, a South Carolina Corporation, individually and for the use and benefit of Tyger–Pensacola Joint Venture, Plaintiff–Appellee,

v.

PENSACOLA CONSTRUCTION COMPANY, a Delaware Corporation, Defendant–Appellant.

Nos. 92–2502, 92–2503.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1994.

Decided July 8, 1994.

138

**ARGUED:** Samuel W. Hixon, III, Williams, Mullen, Christian & Dobbins, Richmond, VA, for appellant. Richard W. Miller, Miller Law Firm, P.C., Kansas, MO, for appellee. **ON BRIEF:** William R. Mauck, Jr., Williams, Mullen, Christian & Dobbins, Richmond, VA, for appellant. Weston A. Sechtem, Miller Law Firm, P.C., Kansas City, MO, for appellee.

Before WILKINS, Circuit Judge, and SPROUSE and CHAPMAN, Senior Circuit Judges.

Reversed and remanded with instructions by published opinion. Senior Circuit Judge CHAPMAN wrote the opinion, in which Judge WILKINS and Senior Circuit Judge SPROUSE joined.

## OPINION

CHAPMAN, Senior Circuit Judge:

The parties to this action formed a joint venture in 1985, its primary purpose being the construction of bridge supports in the James River. When the cost of the project grossly exceeded initial estimates, Tyger Construction Co., Inc. ("Tyger") filed suit against Pensacola Construction Co. ("Pensacola") alleging breach of contract by Pensacola's failure to make capital contributions to the venture as required by their joint ven-

ture agreement. Pensacola filed a counterclaim, alleging, *inter alia,* that Tyger misrepresented to Pensacola that a source of sand for the project was available and the required permits had been obtained to mine the sand. A jury awarded Pensacola $5.6 million on its misrepresentation claim, but the district court granted Tyger's motion for a new trial. After a second trial, the jury again returned a verdict for Pensacola in the amount of $1,578,250. We address Tyger's argument that Pensacola's expert witness's testimony had no factual basis and was too speculative to support a portion of the jury's verdict. We agree and vacate that portion of the verdict based upon this testimony.

I.

Tyger and Pensacola formed a joint venture known as Tyger–Pensacola and entered into a written joint venture agreement on August 15, 1985. The joint venture was awarded a contract by the Virginia Department of Highways and Transportation (VDOT) to construct, among other things, two sand islands in the James River at Newport News, Virginia as part of a bridge tunnel for Interstate 664. Under the agreement, Tyger assumed a 60% interest in the venture and was responsible for the day to day activities. Pensacola assumed the remaining 40% interest, and each party was to contribute its pro rata share of capital to the venture.

Meetings were held by the parties during the summer of 1985 to estimate the costs of performing the project and submitting a bid. The parties had differing opinions as to the source of sand; Pensacola felt that Great Lakes Dredging Company ("Great Lakes") should be used, but Tyger believed a cheaper source could be found.

On July 21, 1985, Paul Silvestri, the vice-president of engineering for Tyger, received several quotations from Lone Star Cement Company ("Lone Star"), a local sand supplier. These quotes were provided by Dick Lynch, a Lone Star representative, and were for allotments of sand from four pieces of property, one of which was the Waitman tract.

On July 22, Lynch met with Silvestri and provided a revised quotation on the Waitman tract, offering sand from that property at 50 cents per ton. Lynch told Silvestri that he could obtain the necessary permits, but he warned that the Waitman source was not yet finalized.

The final bid to the VDOT was due July 23, 1985. In anticipation of this date, the parties met on July 22, and discussed, among other things, the source of sand. Silvestri was the sole Tyger representative at the meeting, and he relayed the information provided to him by Lone Star. Silvestri testified that he told Pensacola that there was not a problem with obtaining permits, which was confirmed by two of Pensacola's witnesses. However, Ronald J. Capoccia, a Pensacola representative present at the meeting, testified that Silvestri stated that the Waitman tract was secure and all necessary permits had been obtained. J.A., Vol. V, 1540–41. Tyger claims that Silvestri never told Pensacola that the permits were in hand.

The Lone Star figure was used in the final bid, and the joint venture was awarded the contract. Subsequently, Lone Star could not deliver the Waitman tract as the source of sand, and the joint venture was required to seek other sand, which proved more expensive. Until a source of sand could be secured for mining, approximately 500,000 cubic yards of sand were provided by Great Lakes between February 27 and March 27, 1986. The joint venture began mining sand at Eppes Island in April 1986 and continued until late summer 1987.[1] Eppes Island provided the project with 1.25 million cubic yards of sand but could not satisfy the project's entire demand. Another source was located at "Hula/Chisman," approximately 25 miles downstream from Eppes Island, from which the venture removed the final 267,000 cubic yards necessary for completion of the project.

Tyger filed suit against Pensacola in December of 1988, alleging breach of contract and seeking capital contributions that Pensacola allegedly failed to make as required by the parties' agreement. Pensacola filed a counterclaim and Tyger moved for summary judgment. The court granted Tyger's summary judgment motion in the amount of $2,790,000, which judgment was affirmed on appeal by an unpublished opinion of February 22, 1991, 925 F.2d 1457 (Table). The court also dismissed 48 of 51 allegations in the counterclaim alleging misrepresentation and breach of fiduciary duty. Eventually, only one allegation was tried: whether Paul Silvestri misrepresented to Pensacola that Tyger had secured a source of sand and had obtained all necessary permits. The jury returned a verdict of $5.6 million on this claim.

Tyger moved for a new trial, which the court granted, on the ground that the verdict was not supported by the evidence. The district court noted that Pensacola had the burden of establishing a causal connection between any damages claimed and the misrepresentation. The court concluded that Pensacola had not met its burden because the failure to secure the Waitman tract never resulted in a lack of sand, and other problems, particularly with the barges, which carried the sand, and other equipment failure, were the cause for delays in the sand operation. Specifically the court found:

> The [time delay] expenses were never casually (sic) related to the failure of the Waitman tract and, therefore, should not have been considered by the jury in assessing damages. The costs associated with the barges and the two month extension of the project relate to the delay in completing the sand operation. The Court refused to instruct the jury on the subject of delay related damages because it was unchallenged that the Joint Venture was never without a sufficient source of sand. Therefore, the failure to secure the Waitman tract could not be the proximate cause of any expenses incurred as a result of delay in the project. In fact, the issue of delay was never presented to the jury.

J.A., Vol. IV, 1235.

At the second trial, Pensacola attempted to prove that the joint venture incurred addi-

---

1. Shirley Hole, referred to occasionally in conjunction with Eppes Island, was the load-out facility used when the Eppes Island pit was being mined.

tional costs of $9,799,474 as a result of the unavailability of the Waitman tract. Pensacola sought to recover 40% of this amount or $3,919,790, representing its 40% interest in the joint venture. At trial, Pensacola used the testimony of its President, Henry B. McCoy, Jr., as an expert in the areas of construction methods and assessment of cost overruns.[2] At his deposition prior to trial, McCoy gave his opinion as to the amount of damages caused by the failure to secure the Waitman tract. Shortly after this deposition and prior to trial, Tyger filed a motion in limine, arguing that McCoy's calculations and damages assessment had no basis in fact. The district court made the following comments in denying the motion:

> In terms of the fact basis, as a general matter, I'm of the opinion that Rule 705 will allow an expert, once they are qualified—and I think that is a threshold area for any expert—once an expert qualifies in a particular field, I think that the Court and the jury can consider any opinion that the expert renders. I believe that if an expert doesn't have an adequate fact basis for that opinion, that is a matter to be brought out on cross-examination.
>
> That is your role as an advocate, and then it is your role as an advocate to argue to a jury that this opinion is not properly based in fact, it should not be given much weight by the jury, if any at all. And I think that basically where you say that there are fallacies in the analysis and fallacies in the reasoning process and in the bases, that those are matters for cross-examination and argument. I make that a general ruling in regard to what you said.

J.A., Vol. IV, 1372.

McCoy testified about damages in several categories, four of which are relevant to this appeal: (1) increased costs of mining an uneconomical sand pit, (2) increased costs due to excessive time, (3) excess supervisor salaries at the pits and (4) excess DBE (Disadvantaged Business Enterprise) fee paid for

the move to the Hula/Chisman pit. Counsel for Pensacola explained to the trial judge the relationship of the first two categories:

> The number that you are talking about, ... [uneconomical sand pit calculation], is inefficiency of mining, hauling, and loading sand. That is an operation that takes place at the pit, in the load-out facility, the Shirley hole that we have been talking about.
>
> Those inefficiencies, because the production there is less than it would have been at Waitman, consequently cause production downstream to be slower. It also causes time to be extended on those operations. That is essentially the job extension costs that are accumulated in the $4 million dollar figure.

J.A., Vol. V, 1726–27.

For his calculation of damages, McCoy relied on numerous documents, including: the work sheet of Ken Chambless, Tyger's cost accountant for the project, on the amount the project cost for each month it overran, cost reports known as 650 reports, sand inventory from the Shirley pit and Eppes Island and Hula/Chisman, the original sand estimate for the Waitman pit, daily reports, summary production reports, etc. J.A., Vol. VI, 1780.[3]

First, McCoy testified that the pit maintenance at Eppes Island was uneconomical because

> we had mined the economical sand out of [the Eppes] mine. We had no other place to go to. Therefore we had to widen out the pit, we had to go deeper, which required more dewatering, wetter sand to handle and haul. We were hauling water instead of sand. We had to rehandle the material by digging deeper. The haul roads would be steeper coming out of the pit. In my opinion, those are some of the items that would cause the cost to increase drastically.

---

2. The court later qualified McCoy as an expert in the following areas: "in assessing costs, expenses, and losses in projects such as the one in issue in this lawsuit and the preparation of estimates and the review of cost accounting reports, and in the analysis of construction methods for

projects such as at issue in this lawsuit." J.A., Vol. VI, 1795.

3. All citations to McCoy's testimony may be found in Volume VI of the joint appendix.

J.A. 1820. McCoy found the final cost of mining at the Eppes pit to be $4.32 per cubic yard. He estimated that a mining operation at Waitman would have cost $2.11 per yard, based on the costs incurred at Hula/Chisman. Actually, the Hula/Chisman operation cost $3.29 per cubic yard of sand ($879,059 total costs/ 267,108 total cubic yard mined). McCoy then lowered the Hula/Chisman figure from $3.29 to $2.11 by employing a "learning curve."[4] Finally, he took the difference between $4.32 and $2.11, or $2.21 and multiplied that by 1,503,000 (the total amount of sand mined from the Eppes Island pit and the Hula/Chisman pit) to obtain $3,043,000. This figure he testified was the cost of mining an uneconomical pit.[5]

Second, McCoy tried to establish the costs of the time delay associated with the mining of the Eppes and Hula/Chisman pits. He used his earlier figures, this time dividing $2.11 by $4.32, to reach what he referred to as an efficiency factor of 48.96%. He then multiplied this efficiency factor by twelve months (August 1986 to September 1987, the amount of time required to mine and place sand) to get 5.88 months, which represented the time he considered to be excess. Next, he multiplied 5.88 months by $754,897 (his revised cost of the sand operation per month) to get $4,438,794, which he testified was the job extension costs attributable to the fact that the Waitman property was not available.[6]

On cross examination, McCoy reiterated that Eppes Island was mined at considerable additional costs due to rehandling material, extra dewatering, and additional reclamation. However, he admitted that he was not prepared to testify as to any specific reclamation costs associated with the Eppes Island mine. J.A. 1853. When requested to specify the difference between the cost of dewatering the Eppes Island mine and the cost to do the same at Hula/Chisman, McCoy responded that he could not. J.A. 1856. Likewise, when McCoy was asked if he could point to

any specific costs associated with how much more it would cost to handle material at Eppes Island than projected at Waitman, McCoy responded, "No, it was from the 650 report that these figures were obtained." J.A. 1856–57.

McCoy conceded that the stockpile of sand at Shirley Hole was never depleted and there was always a good stockpile of sand available from April 1986 to the completion of the project.

Russ Rogers, the joint venture's sand superintendent, testified that the stockpile of mined sand from the Eppes pit was never depleted.

J.A., Vol. VI, 2066–67. Rogers also testified that there was never a demand for sand downriver that the operation could not meet. J.A.2069. Rogers further attributed any delay in the sand operation to equipment failure, particularly at the load out facility at the Shirley pit. J.A.2069. John Johnson, the joint venture's project manager, testified that "[t]here was always sand available to be loaded out." J.A., Vol. VI, 2106. Later, he reiterated, "[t]here was always sand available when we needed it at the job...." J.A. 2106. Johnson attributed delay in the operation to transportation problems, and not to the unavailability of sand. J.A. 2115. However, Johnson did testify that the Eppes mine was more expensive to mine because water had to be pumped from the mine and that the sand from the Eppes mine presented maintenance problems because of its moisture content. J.A. 2119, 2124.

As to the excess supervisor salaries and the excess DBE fee, Pensacola offered no testimony in support of these damage claims. The only reference to these claims was Pensacola's trial exhibit 138, which listed these damages along with corresponding accounting records. The exhibit reads as follows:

*Account*

620–2800    & 968–1001—These are salaries paid to Tyger–Pensacola supervisor

---

4. The learning curve is based on an assumption that the $3.29 cost per cubic yard of sand at Hula/Chisman would have been reduced to $2.11 had 700,000 cubic yards been mined.

5. McCoy's testimony concerning the uneconomical pit calculation can be found in the joint appendix, pp. 1828–30.

6. McCoy's testimony as to excessive time can be found in the joint appendix, pp. 1830–33.

personnel in the sand pit operation. $380,433.

Excess paid $380,433 × 48.96% = 186,260.

620–2700 —DBE fee decreased by 2 1/2% of the excess costs.

See Sheet G.[7] = 63,297

J.A., Vol. VIII, 2567.

The jury awarded Pensacola $1,578,250 or 40% of $3,945,627. Of the $3,945,627, the jury found on a special interrogatories verdict form $1,268,448 for the increased costs of mining an uneconomical sand pit, $1,270,122 for increased costs due to excessive time, $90,543 for excess supervisor salaries at the sand pit, and $38,866 for excess DBE fee paid for the move to Hula/Chisman.[8]

Pensacola's action for an accounting of the joint venture, Count III of its amended counterclaim, proceeded before a United States Magistrate Judge, who issued a report and recommendation in August 1992. The district court affirmed this report and entered a final order and judgment in favor of Tyger in the amount of $21,057.

Tyger and Pensacola have raised several issues on appeal concerning the two trials and the final accounting. We find it necessary to address only one: whether McCoy's testimony had any basis in fact.

## II.

Under Rule 703 of the Federal Rules of Evidence, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Rule 705 allows an expert to testify "in terms of opinion or inference and give reasons thereof without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

■ An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record. *See Eastern Auto Distribs., Inc. v. Peugeot Motors of Am.,* 795 F.2d 329, 337 (4th Cir.1986). An expert's opinion as to damages must be causally related to the alleged harm. *See Nat Harrison Assocs., Inc. v. Gulf States Utils., Co.,* 491 F.2d 578, 588 n. 3 (5th Cir.1974).

■ This court reviews a district court's ruling admitting expert testimony for an abuse of discretion. *Persinger v. Norfolk & W. Ry.,* 920 F.2d 1185, 1187 (4th Cir.1990).

### A.

■ Tyger argues that McCoy's testimony about increased costs caused by time delays associated with a lack of sand is unsupported by the evidence and the district court abused its discretion in admitting it. We agree.

Pensacola had to demonstrate that Tyger's failure to produce the Waitman tract caused the project to experience delay. Pensacola has argued that a lack of sand caused delay. However, McCoy admitted that during the twelve month time period used in his excessive time calculation the sand stockpile was never depleted. His admission was corroborated by two of Tyger's witnesses, Russ Rogers and John Johnson, who both had daily contact with the sand operation. Furthermore, both Rogers and Johnson attributed any delay in the sand operation to equipment failure and logistical problems with the barge system. Pensacola has pointed to the testimony of Paul Silvestri, Tyger President Jonathan Goodier, and Ken Chambless, as confirmation that a lack of sand was delaying the job. Silvestri's cited testimony, however, is directed to the urgency of finding a sand

---

7. Sheet G contains Pensacola's assessment of the overcharges associated with the use of the Eppes Island pit and the Hula/Chisman pit. The overcharges, a total of $2,531,864, were then multiplied by 2 1/2%, or the percentage that the DBE was paid for his work, to get $63,297. Implicit in this calculation is the assumption that the failure to secure the Waitman pit caused the overcharges. J.A., Vol. VIII, 2594.

8. The jury also found other damages representing additional barge costs, costs of the move to Hula/Chisman and costs due to subcontracting with Great Lakes, which total $1,277,698, and have not been appealed.

source during the initial stage of the project and does not address the adequacy of the sand stockpile at the Eppes pit during the time period used by McCoy in his analysis. Goodier's and Chambless's testimony speak more to cost overruns in the sand operation, rather than a lack of a sand stockpile at the Eppes pit.

The evidence is uncontradicted that a sand stockpile existed during the twelve month time period that McCoy used in his calculation, and that the sand operation was delayed for reasons other than Tyger's failure to produce the Waitman tract. Therefore, McCoy's excessive time calculation was based on a faulty assumption that is unsupported by the evidence.

It was an abuse of discretion for the trial court to admit McCoy's testimony that the delays in construction were caused by a lack of, or inefficiencies in the production of, sand. This error resulted from the ·trial judge's belief, expressed at the time it denied the motion in limine as to McCoy's testimony, that the question of whether an expert's opinion had an adequate basis in fact should be handled by opposing counsel through cross examination and in jury argument. The court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury. Expert opinion evidence based on assumptions not supported by the record should be excluded. *See Eastern Auto Distribs., Inc.*, 795 F.2d at 337. Excluding McCoy's excessive time calculation, there remains no evidence establishing a causal connection between Tyger's failure to secure the Waitman tract and any costs associated with excessive time. Therefore, we vacate the jury's award of $1,270,-122.

### B.

■ We next consider McCoy's testimony as to excessive costs associated with mining an uneconomical pit. As noted above, McCoy testified that the Eppes pit was unec-

onomical to mine because of rehandling, dewatering and reclamation. However, on cross examination, McCoy admitted that he could not quantify costs attributable to any of these factors.[9] Although John Johnson, the project manager, testified that the Eppes pit was under water and added expenses were incurred due to this fact, McCoy himself never causally linked the rehandling, dewatering and reclamation to his damages calculation for mining an uneconomical pit.

We do know that McCoy used his calculations to quantify damages of $3,043,000. To arrive at this figure, McCoy used $4.32 as the cost of each cubic yard of sand mined from Eppes. Under an assumption that Hula/Chisman and Waitman were similar pits, McCoy used $3.29 as the cost of sand per cubic yard for Hula/Chisman, but later reduced this figure to $2.11 using his "learning curve." First, the Hula/Chisman figure was used by McCoy because, in his judgment, Hula/Chisman was a comparable pit to Waitman. We find in the record no basis for this conclusion. There is no analysis, either in McCoy's testimony or elsewhere, of the similarities shared by the Waitman pit and the Hula/Chisman pit. In fact, on cross-examination, McCoy admitted that different equipment was used at Hula/Chisman than what was contemplated for Waitman, the haul roads were different in length, and the time spent mining the two pits would have been different. Therefore, his conclusory statement that Hula/Chisman and Waitman were similar mines is without factual support in the record and should have been excluded by the district court.

Second, Tyger has argued that McCoy's use of the "learning curve" has no basis in the record. Tyger points to McCoy's deposition testimony that the concept of the learning curve was thought up "one night on his own." It is also apparent from McCoy's testimony that he reached the $2.11 figure by assuming that the cost to mine Hula/Chisman ($3.29 per cubic yard) would have been de-

---

**9.** In fact, in his deposition, McCoy, when asked why the Eppes pit was more expensive than Waitman would have been, responded: "It was an uneconomical pit to mine; it could have been a lot of different things. Digging deeper you probably would have had more water, they could have rehandled more material. I was not at the job site every day, so I do not know exactly every day-to-day operation."

creased by $1.18 per cubic yard had a total of 700,000 cubic yards been mined at Hula/Chisman.

Pensacola has directed our attention to *Clinchfield R.R. v. Lynch*, 784 F.2d 545 (4th Cir.1986), which merits our consideration at this juncture. In *Lynch*, we affirmed the district court's discretionary admittance of an expert's opinion concerning personal property assessments. Although the expert admitted that, to his knowledge, he was the only economist to employ certain data in an analysis of personal property assessments, we noted that "[a] court should not exclude expert testimony simply because it involves a new method or novel theory." *Id.* at 554. "Unless an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Id.* (quoting *United States v. Baller*, 519 F.2d 463, 466 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975)).

█ We find *Lynch* and the matter at hand distinguishable. In *Lynch*, an expert based his opinion testimony on facts and data from the United States Bureau of Census. This was appropriate under Rule 703 which permits an expert to base his opinion on facts which need not be admissible in evidence, "if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." However, in *Lynch* it was the expert's *method* which was novel and was at issue on appeal. Here, we have an expert espousing an opinion based on assumptions which find no support in the record. Although McCoy's methods are unusual, the greater danger is that the jury may accept as fact not just the faulty assumptions on which he relied, but may also accept the conclusions that are drawn through his use of these assumptions. When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court. Without some basis in fact for McCoy's uneconomical pit calculation, we find that the district court abused its discretion in allowing this line of speculative testimony. Although John Johnson, the joint venture's project manager, testified that water content caused problems at Eppes Island, Pensacola made no demonstration that water would not have caused similar problems at Waitman. Because there is no further evidence which would establish a causative link between the allegation that Eppes was an uneconomical pit compared to Waitman and the damages incurred due to the mining of the uneconomical pit, we now vacate the jury's award of $1,268,448 for the increased costs of mining an uneconomical pit.

### C.

Turning now to the "excess supervisor salaries" calculation, we find for many of the same reasons stated above that this calculation is unsupported by the factual record and should have been removed from the jury's purview. One of the components of the calculation is the 48.96% efficiency figure that we found earlier to be based on illogical assumptions. The calculation also assumes that the use of the Eppes and Hula/Chisman pits caused time delays in the sand operation. As noted above, there is no causal connection between the use of the Eppes and Hula/Chisman pits and any cost overrun due to alleged delays in the sand operation; therefore there can be no connection between excess supervisor fees and the excess costs incurred through delay.

The "excess DBE fee" calculation fails for the same reason. In his calculation, McCoy pulled 18 separate accounts and applied an over-charge factor of either 48.96% or 100% to each account in determining that there was a total overcharge of $2,531,864. Again, the 48.96% efficiency factor is based on unsupported assumptions, and McCoy's overcharge calculation mistakenly assumes that the use of the Eppes and Hula/Chisman pits directly caused the cost overrun in the sand operation. We find the excess supervisor salaries and the excess DBE fee calculations both to be without factual support and therefore speculative in nature. The district court abused its discretion in not removing these calculations from the jury's consideration.

We vacate the jury's verdict as to these two items.

## III.

"Scrutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it.'" *Eastern Auto Distribs., Inc. v. Peugeot Motors of Am.,* 795 F.2d 329, 338 (4th Cir. 1986) (quoting *Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906, 912 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962)). This is particularly true, in a situation such as this, when an expert has apparently taken factual data from the specific project in dispute, and formulated estimates of damages. Without accurate factual support, the damages calculations were speculative and the district court abused its discretion in allowing McCoy's testimony in the areas discussed above. We find the remaining issues presented by the parties to be without merit.

Accordingly, the jury's awards of $1,270,-122 for increased costs due to excessive time, $1,268,448 for increased costs of mining an uneconomical sand pit, $90,543 for excess supervisor salaries at the pits, and $38,866 for excess DBE fee paid for the move to the Hula/Chisman pit must be vacated. The remainder of the verdict, $511,059.20 or 40% of $1,277,698, which was not appealed, will stand.

*REVERSED AND REMANDED WITH INSTRUCTIONS TO VACATE THOSE PORTIONS OF THE VERDICT SET FORTH ABOVE.*