52 F.3d 322
 1995-1 Trade Cases P 70,991
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SEABURY MANAGEMENT, INCORPORATED, Plaintiff-Appellant,
v.
PROFESSIONAL GOLFERS' ASSOCIATION OF AMERICA, INCORPORATED;
Middle Atlantic Section of Professional Golfers'
Association of America, Incorporated,
Defendants-Appellees,
and
Dick Smith; Philadelphia Section of Professional Golfers'
Association, Incorporated, Defendants.
SEABURY MANAGEMENT, INCORPORATED, Plaintiff-Appellant,
v.
PROFESSIONAL GOLFERS' ASSOCIATION OF AMERICA, INCORPORATED;
Middle Atlantic Section of Professional Golfers'
Association of America, Incorporated,
Defendants-Appellees,
and
Dick Smith; Philadelphia Section of Professional Golfers'
Association, Incorporated, Defendants.
 Nos. 94-1814, 94-1688.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 8, 1995.
Decided: April 26, 1995.
 
 ARGUED: William Bradford Reynolds, Sr., COLLIER, SHANNON, RILL & SCOTT, Washington, DC, for Appellant. Stephen M. Sacks, ARNOLD & PORTER, Washington, DC, for Appellees. ON BRIEF: John B. Williams, COLLIER, SHANNON, RILL & SCOTT, Washington, DC, for Appellant. David S. Eggert, Charles W. Scarborough, Lawrence R. Miller, ARNOLD & PORTER, Washington, DC; John H. Lewin, VENABLE, BAETJER & HOWARD, Baltimore, MD, for Appellees.
 Before WILKINS and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Affirmed in part and reversed and remanded in part by unpublished opinion. Judge WILKINS wrote the majority opinion, in which Senior Judge PHILLIPS joined. Judge HAMILTON wrote an opinion dissenting in part.
 OPINION
 WILKINS, Circuit Judge:
 
 
 1
 Seabury Management, Incorporated (Seabury) appeals a decision of the district court granting judgment as a matter of law to the Professional Golfers' Association of America, Incorporated (PGA) and the Middle Atlantic Section of Professional Golfers' Association of America, Incorporated (MAPGA)[1] on Seabury's claims under Secs. 1 and 2 of the Sherman Act, 15 U.S.C.A. Secs. 1, 2 (West Supp.1995), and the Maryland Antitrust Act, Md. Com. Law II Code Ann. Sec. 11-204(a)(1), (2) (Michie 1990). Seabury also challenges the decision of the district court granting judgment as a matter of law with respect to a jury award of compensatory damages on Seabury's breach of contract claim and punitive damages on its claims for tortious interference with contract and prospective business relations. We affirm in part and reverse and remand in part.
 
 I.
 
 2
 In 1989, Seabury entered a five-year contract with the MAPGA that allowed Seabury to produce and promote a golf trade show (the "East Coast Show")--an exhibition of golf equipment and apparel offered for the benefit of buyers for golf pro shops--under MAPGA sponsorship. The East Coast Show was intended to compete on a national level with two other golf trade shows: the "West Coast Show," sponsored by the Southern California Section of the PGA; and the "PGA Orlando Show," sponsored by the PGA.
 
 
 3
 The first East Coast Show took place in 1990 in Baltimore, Maryland. Because Seabury was unable to lease sufficient exhibit space within the boundaries of the MAPGA, it arranged to produce the 1991 East Coast Show in Atlantic City, New Jersey--within the geographic boundaries of the Philadelphia Section of the PGA. After the PGA objected to a section-sponsored activity occurring outside of section boundaries, a compromise was reached in which Seabury was allowed to continue with its plans for the 1991 Show in Atlantic City but was required to conduct subsequent East Coast Shows at a location within the boundaries of the MAPGA. Nevertheless, in 1992 Seabury again planned to produce the East Coast Show in Atlantic City, once more because of an inability to find adequate exhibit space within the boundaries of the MAPGA. After the PGA refused to allow the 1992 Show to proceed, Seabury cancelled its plans. Ultimately, the PGA ordered the MAPGA to withdraw its sponsorship of the East Coast Show, even though it recognized that this action would be a breach of the contract with Seabury. Indeed, with its direction that the MAPGA breach its contract came the PGA's assurance that it would indemnify the MAPGA for costs and damages resulting from any lawsuit brought by Seabury.
 
 
 4
 Seabury then filed suit against the PGA and the MAPGA and proceeded to trial on the following claims:[2]
 
 
 5
 Count One:Breach of contract against the MAPGA;
 
 
 6
 Count Two:Tortious interference with contract against the PGA;
 
 
 7
 Count Three:Tortious interference with prospective business relations against the PGA;
 
 
 8
 Count Four:Monopolization in violation of Sec. 2 of the Sherman Act, 15 U.S.C.A. Sec. 2, against the PGA;
 
 
 9
 Count Five:Attempted monopolization in violation of Sec. 2 of the Sherman Act against the PGA;
 
 
 10
 Count Six:Conspiracy or combination to monopolize in violation of Sec. 2 of the Sherman Act against the PGA and the MAPGA;
 
 
 11
 Count Seven:Restraint of trade in violation of Sec. 1 of the Sherman Act, 15 U.S.C.A. Sec. 1, against the MAPGA and the PGA;
 
 
 12
 Count Nine:Monopolization in violation of the Maryland Antitrust Act, Md. Com. Law II Code Ann. Sec. 11-204(a)(2), against the PGA;
 
 
 13
 Count Ten:Attempted monopolization in violation of the Maryland Antitrust Act, Md. Com. Law II Code Ann. Sec. 11-204(a)(2), against the PGA;
 
 
 14
 Count Eleven:Conspiracy or combination to monopolize in violation of the Maryland Antitrust Act, Md. Com. Law II Code Ann. Sec. 11-204(a)(2), against the MAPGA and the PGA;
 
 
 15
 Count Twelve:Unreasonable restraint of trade in violation of the Maryland Antitrust Act, Md. Com. Law II Code Ann. Sec. 11-204(a)(1), against the MAPGA and the PGA.
 
 
 16
 The jury returned a special verdict finding in Seabury's favor on all counts and awarding $2.6 million in compensatory damages and $4.8 million in punitive damages.
 
 
 17
 The district court granted judgment as a matter of law to Appellees on all counts except the breach of contract claim. However, finding that Seabury had failed to offer evidence from which a jury could find actual damages caused by the breach of contract, the court granted judgment as a matter of law on the compensatory damages award. Further, the district court granted judgment as a matter of law on the punitive damages award on the bases that the PGA had a qualified privilege to interfere with the MAPGA's contractual relations and that Seabury had failed to prove actual malice on the part of the PGA. Finally, the district court awarded attorneys' fees to Seabury for costs incurred in litigating the breach of contract claim.
 
 
 18
 This court reviews the decision of the district court to grant judgment as a matter of law by determining whether, viewing the evidence in the light most favorable to Seabury, a jury could reasonably return a verdict in Seabury's favor. See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 351 (4th Cir.1994). Judgment as a matter of law may not be granted "[i]f there is evidence of such quality and weight that reasonable and fair-minded [jurors] in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party." Id. (internal quotation marks omitted). We review the decision of the district court to grant judgment as a matter of law de novo. United States v. Vanhorn, 20 F.3d 104, 109 (4th Cir.1994).
 
 II.
 A.
 
 19
 Seabury first challenges the grant of judgment as a matter of law as to its claims of restraint of trade (Counts Seven and Twelve), arguing that the district court erred in concluding that the MAPGA and the PGA are a single economic unit, which is legally incapable of conspiring under the Sherman Act.[3] See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 766-77 (1984) (holding that a corporation and its wholly-owned subsidiary are not capable of conspiring in violation of Sec. 1 of the Sherman Act). Although the Copperweld Court specifically declined to decide whether a parent corporation may conspire "with an affiliated corporation it does not completely own," id. at 767, we have since used the factors articulated in Copperweld to find related entities incapable of conspiring in restraint of trade. See, e.g., Oksanen v. Page Memorial Hosp., 945 F.2d 696, 703-05 (4th Cir.1991) (en banc) (examining "the substance, rather than the form, of the relationship" and the degree of control exercised by hospital's Board of Trustees to find hospital and its medical staff incapable of conspiring), cert. denied, 502 U.S. 1074 (1992); Advanced Health-Care Servs., Inc. v. Radford Community Hosp., 910 F.2d 139, 146 (4th Cir.1990) (holding two wholly-owned subsidiaries of the same parent corporation are legally incapable of conspiring).
 
 
 20
 After examining the relationship between the PGA and the MAPGA, we are convinced that no reasonable trier of fact could have found them to be separate entities. We therefore affirm on the reasoning of the district court the grant of judgment as a matter of law on Counts Seven and Twelve.[4] Seabury Management, Inc. v. Professional Golfers' Ass'n of Am., Inc., No. 92-530, 1994 WL 772873, at * 3-6 (D. Md. Apr. 26, 1994).
 
 B.
 
 21
 Seabury next asserts that the district court erred in granting judgment as a matter of law on its monopolization claims (Counts Four, Five, Six, Nine, Ten, and Eleven). We agree with the district court that Seabury has failed to define a relevant market and that its monopolization claims therefore must fail.
 
 
 22
 In order to prevail on its monopolization claims, Seabury must prove: (1) that the PGA possessed monopoly power in a relevant market; (2) that the PGA willfully acquired and maintained that power to the exclusion of Seabury; and (3) causal antitrust injury. See Advanced Health-Care Servs., Inc., 910 F.2d at 147. "Proof of a relevant market is a threshold requirement for a Sherman Act Sec. 2 claim." Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 493 (4th Cir.1986), cert. denied, 481 U.S. 1050 (1987). The key to defining the relevant market is the interchangeability of products: "A relevant market ... is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." International Wood Processors v. Power Dry, Inc., 792 F.2d 416, 430 (4th Cir.1986) (internal quotation marks omitted). Moreover, it is "a fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition." Oksanen, 945 F.2d at 709.
 
 
 23
 Seabury advances two related arguments regarding the relevant market. First, Seabury claims that the relevant market consisted only of golf trade shows, as opposed to other methods of marketing golf equipment and merchandise. Second, Seabury contends that the market of golf trade shows should be limited to the PGA Orlando Show and the East Coast Show.
 
 
 24
 The district court correctly found that there is sufficient evidence to support Seabury's first claim--that the relevant market consists of golf trade shows. Although manufacturers and distributors of golf equipment and apparel employ a variety of marketing techniques--including direct mail, door-to-door solicitation, and catalogue sales--golf trade shows are unique in that they gather multiple sellers under one roof and provide services not available through other marketing techniques, such as business seminars, fashion shows, and the ability to meet face-to-face with distributors. In sum, a reasonable trier of fact could conclude that golf trade shows comprise the relevant market for purposes of Seabury's Sec. 2 claim.
 
 
 25
 However, Seabury failed to present sufficient evidence to support its next contention--that the relevant market of golf trade shows included only the PGA Orlando Show and the East Coast Show.
 
 
 26
 Although the record does not indicate exactly how many golf trade shows take place in the United States each year, the number appears to be substantial. In addition to the West Coast Show, the PGA Orlando Show, and the East Coast Show, smaller trade shows are operated by individual sections, groups of manufacturers, and other organizations. And, as the district court noted, all of these shows compete with each other for the attention of buyers. Nevertheless, Seabury's expert excluded from the relevant market the West Coast Show and all smaller golf trade shows; this exclusion was not supported by any evidence such as estimates of market share, attendance figures, or demographic studies. Thus, because the testimony of Seabury's expert "is not supported by sufficient facts to validate it in the eyes of the law," Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 113 S.Ct. 2578, 2598 (1993), we conclude that Seabury has failed to prove the existence of a relevant market. Accordingly, we affirm the grant of judgment as a matter of law on Seabury's monopolization claims on the reasoning of the district court. Seabury Management, Inc., 1994 WL 772873, at * 6-9.
 
 III.
 
 27
 Seabury also contends that it was error for the district court to vacate the awards of compensatory and punitive damages on the basis that neither award was supported by the evidence.
 
 A.
 
 28
 Seabury presented evidence to the jury on two measures of actual damages: lost profits and the lost value of its business. Both theories were premised upon a comparison of the 1991 East Coast Show to the West Coast Show in the years 1987-1992--its seventh through twelfth years of operation. The PGA protested that excluding the first six years of the existence of the West Coast Show rendered the comparison to the 1991 East Coast Show--then in its second year of operation--inappropriate and overestimated the value of the East Coast Show. Seabury's expert on damages, Nicholas Rey, testified that this comparison was appropriate because the East Coast Show was professionally managed from the outset, while the West Coast Show was not professionally managed until 1987, and because the East Coast Show had a potential market as great, if not greater, than that of the West Coast Show.
 
 
 29
 Rey estimated Seabury's lost profits by calculating an annual growth rate of 38% for the profits of the West Coast Show and applying this rate to the "profits" from the 1991 East Coast Show. However, because the 1991 East Coast Show actually had operated at a $32,000 loss,[5] Rey recalculated the revenues and expenses to reach a figure he termed the "direct profit" of the 1991 East Coast Show--$158,000. Rey arrived at this figure by subtracting from the Show's gross revenue only those expenses that he claimed were "directly related" to the Show itself, such as rental fees, security, decorating, catering, and so forth. Rey did not subtract expenses related to operating Seabury--e.g., office space and employee salaries. Based on a direct profit of $158,000 for the 1991 East Coast Show, Rey estimated that Seabury lost profits with a present value of approximately $400,000.
 
 
 30
 We agree with the district court that Rey's "direct profit" method of calculating the lost profits of the East Coast Show must be rejected as arbitrary and "scientifically unacceptable." The East Coast Show was Seabury's only venture; thus, it was improper for Rey not to subtract the expenses of operating Seabury from the revenues of the East Coast Show--Seabury's only means of paying its expenses. And, because the initial calculation of direct profits is invalid, the estimate of lost profits derived from that figure is necessarily invalid. We therefore conclude that no reasonable trier of fact could have based an award of compensatory damages on Seabury's lost profits from the East Coast Show.[6] As a separate measure of Seabury's damages, Rey estimated the lost value of the business as a going concern. Based on the PGA's recent purchase of the West Coast Show for a present value of $8.7 million, Rey derived multipliers from the ratios of: (1) the purchase price to the gross revenues of the 1992 West Coast Show (5.64); and (2) the purchase price to the direct profits of the 1992 West Coast Show (8.28). Rey then applied these multipliers to the projected gross revenues and direct profits of the 1992 East Coast Show[7] to reach a range of values for the East Coast Show of $1.6 to 2.3 million.[8] Rey also testified that this method of measuring the going concern value of a business was the same method used by the PGA to determine the price it was willing to pay for the West Coast Show.
 
 
 31
 We begin by noting that there is sufficient evidence to support a finding by the jury that the West Coast Show and the East Coast Show were comparable for purposes of calculating damages. Rey carefully articulated his reasons for making the comparison and his testimony was supported by the testimony of other witnesses regarding the growth potential of the East Coast Show. Accordingly, we reject the argument that Seabury has failed to prove damages because a reasonable jury could not find that the East Coast Show was comparable to the West Coast Show. Moreover, we note that the PGA conceded at trial--provided the comparison to the West Coast Show was supportable--that the financial calculations presented by Rey were otherwise correct.
 
 
 32
 Further, Seabury has presented adequate evidence to support an award of damages based on the lost value of the East Coast Show as a going concern. Under Maryland law, once a plaintiff has proven with certainty the fact of damages resulting from the defendant's breach of contract, the amount of those damages "may be left to reasonable inference." M & R Contractors & Builders, Inc. v. Michael, 138 A.2d 350, 355 (Md.1958). It cannot be seriously disputed that the MAPGA's breach of its contract with Seabury caused damage. And, given our conclusion as to the validity of the comparison to the West Coast Show, we are persuaded that Seabury has provided sufficient evidence to support an award of compensatory damages in some amount. However, the evidence does not support a compensatory damages award greater than $2.3 million--the upper end of the range of values given by Rey for the East Coast Show. Therefore, we reverse the grant of judgment as a matter of law with respect to the compensatory damages award and remand for further proceedings.[9]
 
 B.
 
 33
 Finally, Seabury challenges the grant of judgment as a matter of law with respect to the award of punitive damages.[10] The district court concluded that the PGA was privileged to interfere with the contract and that even if the PGA had tortiously interfered with the MAPGA Seabury contract and with business relations between Seabury and the MAPGA, Seabury had failed to prove the element of malice necessary for a punitive damages award. See Schaefer v. Miller, 587 A.2d 491, 493 (Md.1991).
 
 
 34
 Under Maryland law, actual malice is "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." Id. (internal quotation marks omitted). Seabury simply has presented no evidence indicating that the PGA acted with an intent to injure Seabury. The record clearly shows that the PGA prompted the MAPGA to breach its contract with Seabury because the PGA believed that the contract was adverse to its economic interests, not because the PGA harbored any ill will toward Seabury. We therefore affirm on the reasoning of the district court its decision granting judgment as a matter of law on the award of punitive damages. Seabury Management, Inc., 1994 WL 772873, at * 13.
 
 IV.
 
 35
 We hold that the district court properly granted judgment as a matter of law to the PGA and the MAPGA on Seabury's antitrust and tortious interference with contract and prospective business relations claims and on the award of punitive damages. However, because a reasonable jury could have concluded that Seabury was entitled to a determinable amount of compensatory damages, we conclude that the district court erred in granting judgment as a matter of law on the compensatory damages award. Accordingly, we remand for further proceedings consistent with this opinion.
 
 
 36
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 HAMILTON, Circuit Judge, dissenting in part:
 
 37
 I agree with all of the majority opinion, save the reversal and remand with respect to compensatory damages on the theory that Seabury lost value as a going business concern as stated in Part III A. Because Seabury did not, as the district court ruled, establish its injury or its damages by any reasonable or reliable method of computation, Seabury is not entitled to compensatory damages, but only nominal damages, as a result of the PGA's breach.
 
 I.
 
 38
 Like the majority, I agree that Seabury is not entitled to recover compensatory damages on its antitrust claims or under its lost profits theory with respect to the breach of contract claim. The jury awarded Seabury $2.6 million in compensatory damages for all contract and antitrust claims. After characterizing the jury's award of damages as "grossly excessive," ostensibly because the upper range of damages that Seabury's evidence tended to prove was only $2.3 million, the district court set this verdict aside, ruling that there was no reliable evidence that could support it. The district court declined the possibility of remittitur because it concluded that Seabury had failed to establish any amount of damages with reasonable certainty, thereby providing no basis for remittitur.
 
 II.
 
 39
 I cannot agree with the majority's conclusion that Seabury was injured and proved its compensatory damages with reasonable certainty on the theory that it lost value of its business as a going concern. Under Maryland law, "if a party fails to prove compensatory damages[,] he is only entitled to the recovery of nominal damages." Asibem Assoc. v. Rill, 286 A.2d 160, 162 (Md.1972); see also E. Allan Farnsworth, Contracts Sec. 12.8, at 838-39 (7th ed.1982). To recover compensatory damages, however, Seabury must prove them "with reasonable certainty, and [they] may not be based on speculation or conjecture." Asibem Assoc., 286 A.2d at 162. Here, Seabury has not proved that it was injured nor proved its damages with reasonable certainty. Accordingly, Seabury is not entitled to compensatory damages, but at the most nominal damages. Several reasons compel this conclusion.
 
 
 40
 First, I agree with the majority that once Seabury "has proven with certainty the fact of damages," ante, at 11 (emphasis added), that it would be entitled to recover compensatory damages, but I disagree that Seabury proved its injury or damages, let alone with certainty. Seabury has the burden of proving by a preponderance of the evidence that it suffered injury as a result of the PGA's breach and of establishing its damages with reasonable certainty; and, if after a full trial on the merits, it fails to do so, then the PGA is entitled to judgment as a matter of law on the breach of contract claim. See Paul v. Farmland Indus., 37 F.3d 1274, 1276 (8th Cir.1994), cert. denied, 63 U.S.L.W. 3684 (U.S. Mar. 20, 1995) (No. 94-1262); Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1326-30 (5th Cir.), cert. denied, 115 S.Ct. 71 (1994). The majority implicitly recognizes that Seabury has not established its injury and alleged damages by stating that "Seabury has provided sufficient evidence to support an award of compensatory damages in some amount," ante, at 12 (emphasis added). The majority never states what this "sufficient evidence" is, but merely makes a sweeping statement in a single sentence that the record gives rise to such an inference; there is no such evidence and no explanation of this purported evidence or how it purportedly establishes that Seabury was injured; the condition precedent that "the fact of damages [be] proven with certainty," M & R Contractors & Builders v. Michael, 138 A.2d 350, 355 (Md.1958), has not been satisfied here. In addition, the majority states that the damages are in "some amount," which necessarily begs the question of what amount. The majority implicitly acknowledges that Seabury failed to prove its damages with reasonable certainty because if the damages were proven, they would have been proven to a specific, identifiable sum, not the vague "some amount." Seabury, therefore, is not entitled to compensatory damages.
 
 
 41
 Second, in order to establish its claim for compensatory damages based on the theory of lost value of its business as a going concern, which theory is premised on the alleged comparability of Seabury's show with the West Coast Show, Seabury must demonstrate the comparability of its East Coast Show to the West Coast Show, an endeavor in which it cannot succeed. The West Coast Show and Sea bury's show are not at all comparable, as the record conclusively establishes: the West Coast Show is thirteen years old, and in 1991 had gross revenues of $929,000, profits of $518,000, 932 exhibitors, and 13,000 persons attending, as compared to Seabury in 1991, which commenced its second year, experienced gross revenues of $293,000, losses of $32,000, 193 exhibitors, and 1,600 persons attending. Neither the majority nor Seabury even attempt to explain Seabury's failing financial health. Ironically, Seabury argues that the West Coast Show should be excluded for purposes of establishing the relevant market, but then compares itself as being similar to the West Coast Show. Seabury seeks to have it both ways. Because the shows are not comparable, Seabury cannot prevail. See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1044 n. 21 (4th Cir.1987) (approving use of comparability method for calculating damages in antitrust case, but explaining that there must be "reasonable comparability between the business or markets in question"), cert. denied, 486 U.S. 1017 (1988); Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1205-08 (1st Cir.1987) (explaining that in an antitrust suit the businesses being compared must be comparable for purposes of calculating damages and stating that comparing a Rhode Island business with a Tennessee business was not sufficiently comparable and noting further that plaintiff failed to compare itself with like businesses in the relevant geographic area and thus holding that compensatory damages had not been proved). That Seabury's show and the West Coast Show were not at all comparable for any purposes is beyond cavil; the majority recognizes this fact, at least for purposes of the direct profits method of calculation. See ante at 9-10. Despite this recognition, the majority, with no analysis, asserts that the shows are comparable for purposes of Seabury's ascertaining damages as a going concern. To hold that the shows are incomparable for proving damages in one instance, yet comparable for proving damages in another instance is anomalous, particularly in the absence of any reasoning, as here.
 
 
 42
 Nevertheless, Seabury contends that comparison with the West Coast Show is apt because there was testimony that the shows offered similar services, were each three-days long and held in late August, run by experienced trade show personnel, and Seabury's show was patterned after the West Coast Show. Seabury's expert Nicholas Rey assumed that Seabury's show would grow at the same rate that the West Coast Show grew--thirty-eight percent per year. This figure was reached only after excluding the first six years of the West Coast Show's operation. Seabury contends that exclusion of the first six years of the West Coast Show was proper for purposes of comparison, because during this time, the West Coast Show was regional and the latter seven years of the West Coast Show, when it was larger, was more akin to the type of show sponsored by Seabury. Rey assumed Seabury's growth rate to be thirty-eight percent, with an alternative growth rate of twenty-five percent, based on the forecasted growth of the West Coast Show from 1992-96. Even if the shows were comparable, there is no principled basis for excluding the first six years of the West Coast Show from the damages calculation. This permits Seabury to compare its fledgling business with only the more profitable years of an established business. Seabury's show is simply not comparable to the West Coast Show.
 
 
 43
 Third, Rey assumed that in the event of a sale of Seabury's show, the price ratio or "multiplier" would be the same as it was on the sale of the West Coast Show, whether measured in terms of direct profits or gross revenues. The district court characterized this method of calculating damages as "disingenuous, manipulative and scientifically unacceptable" and generating "a meaningless and artificial number." (J.A. at 1176). I agree. Apart from being fraught with speculation, implicit in this theory is the fact Seabury and the West Coast Show are comparable, but, as conclusively demonstrated above, they are not. Also, there is no principled basis for Rey's determination of the West Coast Show's profits--there is no evidence demonstrating how such profits were calculated and then subsequently applied to Seabury to calculate Seabury's damages. Circuit precedent does not support the majority's conclusion for reliance on Rey's testimony. For instance, in Tyger Construction Co. v. Pensacola Construction Co., 29 F.3d 137, 142 (4th Cir.1994), cert. denied, 115 S.Ct. 729 (1995), we concluded that expert opinion had no value if "based on assumptions which are speculative and are not supported by the record." We have cautioned repeatedly against testimony the likes of Rey's. See Eastern Auto Distrib., Inc. v. Peugeot Motors of Am., Inc., 795 F.2d 329, 338 (4th Cir.1986) ("Scrutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it.' ") (quoting Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 912 (2d Cir.), cert. denied, 369 U.S. 865 (1962)).
 
 
 44
 Fourth, despite these numerical manipulations, which are extrapolated from invalid assumptions, Seabury lost no value as a going concern. A "going concern" is "[a]n enterprise which is being carried on as a whole, and with some particular object in view. The term refers to an existing solvent business, which is being conducted in the usual and ordinary way for which it was organized." Black's Law Dictionary 821 (4th ed.1968). Seabury was shrinking and losing money; it simply was not a going concern.
 
 III.
 
 45
 I submit that the inescapable conclusion is that Seabury failed to establish that it was injured or lost value of its business as a going concern; consequently, Seabury failed to prove compensatory damages with any reasonable certainty. Accordingly, Seabury was entitled to no more than nominal damages, "commonly six cents or a dollar, fixed without regard to the amount of the loss." E. Allan Farnsworth, Contracts Sec. 12.8, at 839 (7th ed.1982). The majority endorses Seabury's theory of compensatory damages, i.e., lost value of its business as a going concern, which is premised on speculation, conjecture, and invalid assumptions, not evidence. Because I cannot subscribe to this reasoning, I respectfully dissent.
 
 
 
 [1]
 The PGA is a national, nonprofit organization of golf professionals. It is geographically divided into six divisions, each of which is further divided into several sections, such as the MAPGA
 
 
 [2]
 The district court granted summary judgment to Appellees on two counts (Eight and Thirteen). Seabury does not appeal this ruling
 
 
 [3]
 Maryland law specifies that the interpretation of the federal antitrust statutes controls the interpretation of the Maryland Antitrust Act. See Md. Com. Law II Code Ann. Sec. 11-202(a)(2) (Michie 1990). Accordingly, we need discuss only federal law
 
 
 [4]
 Seabury also claimed that the PGA conspired with the Golf Manufacturers and Distributors Association (GMDA), a trade association of vendors of golf equipment and apparel. We agree with the district court that Seabury failed to produce any evidence of an agreement between the PGA and the GMDA and conclude that Seabury's appeal as to this issue is without merit. See Seabury Management, Inc., 1994 WL 772873, at * 5-6
 
 
 [5]
 At trial, Seabury presented evidence that the decline in revenues for the 1991 Show was due to a severe storm that struck the Atlantic City area during the week of the Show, making travel to and from Atlantic City difficult
 
 
 [6]
 The dissent asserts that our rejection of Rey's direct profits calculation is necessarily a rejection of the comparability of the West Coast Show and the East Coast Show. See post at 15-16. This is not the case, however. The lost profits calculation is based on two premises: first, that the 1991 East Coast Show earned direct profits of $158,000; and second, that a reasonable jury could find the growth rates of the East Coast Show and the West Coast Show to be comparable. We reject only the former premise
 
 
 [7]
 The parties apparently do not contest that it was appropriate to apply the multipliers to projected values for the 1992 East Coast Show
 
 
 [8]
 Even if application of a multiplier derived from the direct profits of the West Coast Show to the direct profits of the East Coast Show was inappropriate--which we do not believe to be the case given that Rey was comparing corresponding numbers for both shows--at the very least, application of the gross revenue multiplier produced a range of values of $1.8 to 2.3 million
 
 
 [9]
 We leave it to the district court to determine in the first instance the most appropriate manner of resolving the issue of compensatory damages on remand
 
 
 [10]
 The punitive damages award was premised on the tortious interference claims (Counts Two and Three). Because the PGA stipulated that it would be liable for any damages resulting from the MAPGA's breach of its contract with Seabury, the district court did not submit these claims to the jury; instead, the instructions related to Counts Two and Three were subsumed in the instructions on punitive damages